Argued and submitted November 21, 1979,
resubmitted in banc April 9,
affirmed April 14, reconsideration denied June 16,
petition for review allowed September 3, 1980
See later issue Oregon Reports

STATE OF OREGON,
*Appellant,*

*v.*

LEROY FRANKLIN KENNEDY,
*Respondent.*

(No. C 79-01-30055, CA 15145)

609 P2d 438

[911]

James M. Brown, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Ann Morgenstern, Portland, argued the cause for respondent. With her on the brief was George M. Jenks, Portland.

CAMPBELL, J.

**CAMPBELL, J.**

The state appeals from a trial court order suppressing evidence seized in a search of defendant at Portland International Airport. The trial court ruled that the police lacked reasonable suspicion to stop defendant. We affirm.

At the pretrial suppression hearing the state introduced the following evidence. Officer McLaughlin of the Portland Police Department received a call from a Fort Lauderdale, Florida, police officer informing him that two persons who fit a "drug smuggler's profile" had boarded a plane bound for Portland. The Florida officer related the following information concerning the suspects: (1) a detailed physical description of defendant and his companion; (2) defendant arrived at the airport ten minutes before the flight and had only hand luggage; (3) one person bought both one-way tickets, paying with cash; (4) defendant was carrying a "large amount" of cash; (5) they appeared nervous as if they were being watched; and (6) they left a phone number of a hotel with the airline clerk from whom they purchased the tickets, and the detective, by inquiring at the hotel, learned that no one by defendant's name had been registered there during the past few days.

After calling Fort Lauderdale and verifying the officer's identity and the facts previously related, Officer McLaughlin and several other officers went to Portland Airport to intercept defendant and his companion. Two officers followed defendant through the baggage claim area where they picked up no luggage and one of the officers, Officer Johnston, hailed defendant on the escalator in the underground passageway to the parking lot. He testified there was nothing unusual about defendant's conduct and that he acted solely on the basis of the information from Florida. According to Johnston, defendant turned to Johnston and asked if Johnston was addressing him. Johnston, who was out of uniform, identified himself

as a police officer and displayed his badge. A second officer was present and stood behind Officer Johnston. Johnston then informed defendant that he "had information that led [him] to believe" that defendant was carrying narcotics on his person or in his luggage. Defendant denied that he was carrying narcotics and offered to let Johnston search his luggage. The search turned up a small glass vial, empty on the inside, but which had a white powder along the threads, and a razor blade with masking tape over the edge. The white powder was identified by Johnston as cocaine. Defendant denied knowledge of the origin of the vial. After further events not pertinent to this appeal, the officers escorted defendant to his car and released him.

We first address the question whether the police needed any justification in order to initiate the encounter with defendant. In *State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978), the court set out three generally recognized categories of police-citizen "street encounters," in descending order of justification:

> "(1) arrest, justified only by probable cause; (2) temporary restraint of the citizen's liberty (a 'stop'), justified by reasonable suspicion (or reliable indicia) of the citizen's criminal activity; and (3) questioning without any restraint of liberty (mere conversation), requiring no justification." (Footnote omitted.)

The issue here is whether the encounter was a "stop" or "mere conversation." The ultimate test for a stop is whether, under all the circumstances, the person encountered would feel free to walk away. *State v. Evans*, 16 Or App 189, 196, 517 P2d 1225 (1974).

The person's cooperation with the officer after the initiation of the encounter is not determinative on the question of whether a stop occurred. All that need be shown is that the person altered his course of conduct in response to the officer's show of authority. *State v. Warner, supra*, 284 Or at 162.

[914]

When Officer Johnston identified himself, displayed his badge, and told defendant he had reason to believe defendant was carrying narcotics, it must have become apparent to defendant that the officer was investigating a serious crime and that defendant was the suspect. We reject the state's suggestion that this encounter was "mere conversation." We conclude that a reasonable person faced with the officer's accusation would not feel free to ignore the officer and walk away and, therefore, a stop occurred at that point.

In order to justify the stop, the officer was required to have reasonable suspicion that defendant had committed a crime. ORS 131.615(1). ORS 131.605(4) provides:

" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

We understand the state to argue that the profile, either alone or in combination with the underlying information relayed by the Florida detective, is sufficient to justify the stop. We will deal with the profile and the underlying information separately.

THE PROFILE

The only evidence in the record as to the nature of the drug trafficker's profile reportedly applied in this case is the following testimony of Officer McLaughlin:

"Q. Can you explain to the Court what you mean by a smuggler's or drug trafficker's profile?

"A. It is information which was gathered by Drug Enforcement Administration, Los Angeles Police Department, and other agencies that contributed to this.

"And basically, what it says, people that match this profile tend to be involved in smuggling or transporting drugs. It is a lot like the hijacker's profile that is used by the Aeronautics Administration.

"Q. Okay. Now, did Detective Berks relate to you any specific experience he had had with employing this drug trafficker profile?

[915]

"A. Well, he had been using it approximately eight months and, during those eight months, he had made approximately fifty cases.

"Q. What do you mean by 'he had made fifty cases'?

"A. Well, he provided information to outside agencies or had stopped someone at the airport that had triggered the drug smuggler's profile and, subsequent to those stops, were conversations that he obtained permission to search their baggage or their person, as the case might be, and drugs were found.

"Q. Now, have you, in the course of your employment with the Portland Police Bureau, had any experience yourself—or other members of the SID Division—with the actual use of this profile?

"A. Yes, sir, we have.

"Q. And what is that?

"A. Within the past year, I have been involved in three of these drug smuggler profiles. And the office, outside of myself, has had one other experience. So there would be four in the past year.

"And on each of these occasions, information similar to this has been provided to us, matching descriptions of the person or persons involved in suspected drug trafficking. We would go out to the airport, meet them out there, ask permission to talk to them for awhile, explain to them who we are, or what we are doing out there, why we are there, and ask permission to search their person or their bags or both.

"And then, having received the permission, then we would make the search and, on all the occasions, we have either found drugs or drugs have been—on one occasion, drugs were attempted to be destroyed and enough were found on the floor and scraped up—and in the residue of the balloons—that the District Attorney's office has issued prosecution on each of the four cases.

"Q. So you are telling the court that, in every instance that you have acted upon information provided in the framework of the drug trafficker's profile, that, in every instance, it has resulted in a discovery of dangerous or narcotic drugs?

"A. Yes, sir."

Whether or not such a profile could ever be sufficient to justify a stop,[1] by itself or in conjunction with other factors, the testimony here does not supply us with enough information from which to judge the profile's reliability. For instance, we have no evidence as to the elements making up the profile, the number of these elements that must be satisfied for the police to conclude that a suspect fits the profile, or the basis for including each element in the profile. Further, knowing only that a Florida officer successfully applied the profile 50 times in eight months in an undisclosed number of cases, and that Officer McLaughlin is aware of four successful applications of the profile out of four cases in a one-year period, adds nothing to our knowledge of the profile.

In contrast, in *United States v. Lopez*, 328 F Supp 1077 (E.D.N.Y. 1971), where the court analyzed the use of a hijacker's profile during the airline boarding process, the court held an in camera hearing during which it received detailed testimony as to: the studies underlying the profile; the procedures used in developing the profile; the statistical, sociological and psychological data and techniques supporting the profile; the elements of the profile; and the method in which the profile was applied, as an integral part of more extensive procedures, by airport personnel in isolating potential hijackers for investigation. The court notes that the profile contained a number of characteristics in which hijackers differ significantly from other passengers, and that the statistics before the court demonstrated the profile's high degree of reliability. The characteristics could be observed, the court stated, without the exercise of discretion, and did not discriminate against any group on religious, social, political or racial grounds. On the basis of this evidence, the court stated that if the profile had been

---

[1] The United States Supreme Court is currently reviewing a case involving the validity of the use by the Drug Enforcement Administration of its "drug courier profile" at major city airports as a basis for stopping suspects. 48 USLW 1139 (March 11, 1980).

strictly adhered to in the case, the stop would have been permissible. The court granted the defendant's motion to suppress, however, since changes made in the profile by airline personnel, injecting elements of discretion and ethnic prejudice, destroyed "the essential neutrality and objectivity of the approved profile." 328 F Supp at 1101.

Lacking an evidentiary basis upon which to judge the profile reportedly applied to defendant, we reject any attempt to justify the stop on the basis of that profile, either alone or in combination with other facts.

## THE UNDERLYING FACTS

The "facts" relied on by the state to create reasonable suspicion are simply inadequate to justify anything stronger than a hunch that defendant was trafficking in narcotics. It is likely that millions of quite law-abiding air travelers each year arrive at the airport shortly before a flight. The fact that defendant was carrying only hand luggage seems innocuous, and is in fact probably characteristic of a great many innocent travelers. It is still legal to pay with cash rather than by credit card, and we have no idea how much money a "large amount" is. Nervousness at airports is not unusual and is quite consistent with the ordinary stress encountered in the airport environment. This nervousness may easily be seen as a result of defendant's arrival at the airport only a short time before his scheduled flight, a fact which, as stated above, is unremarkable. As the trial court aptly stated, defendant's use of a false name, and his other actions, were equally consistent with the notion that defendant had been seeing a woman other than his wife.

Individually, these facts are unrevealing. Collectively, they might arouse one's curiosity but certainly not a reasonable suspicion that defendant was a drug trafficker. *See State v. Valdez*, 277 Or 621, 561 P2d 1006 (1977).

Contrary to the dissent's argument, *State v. Evans*, 16 Or App 189, 517 P2d 1225, *rev den* (1974), does not

support the police action here. Even assuming for the sake of argument that the officers had authority for a slight restraint of defendant's liberty in order to "make reasonable inquiries about his identity and purpose in being abroad," 16 Or App at 196, the officers' conduct here went beyond that slight intrusion to a point not "justified by the articulable quantum of knowledge they have and by the gravity of the police purpose served." 16 Or App at 194.

Since the officers lacked reasonable suspicion to stop defendant, and the degree of intensity of the intrusion on defendant's liberty was impermissible, defendant's consent to the search is irrelevant. Accordingly, the evidence was properly suppressed.

Affirmed.

**THORNTON, J.,** dissenting.

The majority concludes that the police did not have a reasonable basis for stopping defendant and his companion. I cannot agree.

As I see the facts presented here, the police did have reasonable basis for stopping defendant and his companion and making inquiries. I reach this conclusion wholly without reference to the so-called drug trafficker's profile. I find the majority's conclusion untenable and a serious and unwarranted handicap to the police in controlling drug traffic.

The communication from Florida included the following information: (1) a detailed physical description of defendant and his companion; (2) defendant arrived ten minutes before the flight and had only hand luggage; (3) one person bought both one way tickets, paying with cash; (4) defendant was carrying a "large amount" of cash; (5) they appeared nervous as if they were being watched; and (6) they left a phone number of a hotel with the clerk from whom they purchased the tickets and the detective, by inquiring at the hotel,

[919]

learned that no one by defendant's name had been registered there during the past few days.

What constitutes a reasonable suspicion? In the language of ORS 131.605(4),

" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

As we observed in *State v. Evans*, 16 Or App 189, 194, 517 P2d 1225, *rev den* (1974):

" * * * [T]he police may seize or search a person with such a degree of intensity as may be justified by the articulable quantum of knowledge they have and by the gravity of the police purpose to be served."

Here, unlike *Evans*, the police did not choose to harass the defendant at random on the off chance that if they shucked enough oysters they would eventually find a pearl. Rather, they had a small quantum of information from which to suspect that defendant was committing a crime in their presence and, under *Evans*, that slight cause justified a slight intrusion. The police action here was minimal and they had sufficient cause to legally authorize it.

There is one final aspect of this case which the majority fails to mention: Defendant consented to this search.

The evidence that defendant consented to the search was unrebutted. The trial court's finding of voluntariness of this consent is supported by the historical facts and is, therefore, binding on us. *State v. Warner*, 284 Or 147, 585 P2d 681 (1978).

Accordingly, I would reverse and remand for trial.

**TANZER, J., Pro Tempore,** dissenting.

I regard the contact to have been of the third type categorized in *State v. Warner*, 284 Or 147, 161, 585

P2d 681 (1978): "questioning without any restraint of liberty (mere conversation), requiring no justification." Police are as free as others to ask people to speak to them. Only when request becomes command, does the Fourth Amendment come into play. *State v. Evans,* 16 Or App 189, 517 P2d 1225 (1974). The police conduct in this case was consistently in terms of request rather than command and there is no objective basis upon which to find that defendant could not leave. This contact did not involve a use of authority of sufficient magnitude as to be a stop or detention within the meaning of *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

Schwab, C. J., and Gillette, J., join in this dissent.