Argued and submitted October 6, 1980, reversed and
remanded to trial court February 18, 1981

# STATE OF OREGON,
## *Petitioner,*
### *v.*
# LEROY FRANKLIN KENNEDY,
## *Respondent.*

(No. C 79-01-30055, CA 15145, SC 27047)

624 P2d 99

Robert C. Cannon, Assistant Attorney General, Salem,
argued the cause for petitioner. With him on the brief were
James M. Brown, Attorney General, and Walter L. Barrie,
Solicitor General, Salem.

Ann Morgenstern, Portland, argued the cause for respondent. With her on the brief was George M. Jenks, Portland.

Before Denecke, Chief Justice, and Tongue, Howell, Lent, Linde and Peterson, Justices. **

TONGUE, J.

---

**Howell, J., retired effective November 30, 1980.

## TONGUE, J.

Defendant was convicted of the crime of Possession of a Controlled Substance (cocaine) (ORS 475.992). Prior to trial, defendant moved to suppress evidence found in defendant's handbag at Portland International Airport on the grounds that the evidence was seized in a warrantless search after an illegal stop and that any consent to search was "the product of coercion, deception and/or acquiescence to lawful authority." The trial court allowed the motion to suppress. The Court of Appeals affirmed on the ground that there had been a "stop" which was not based upon "reasonable suspicion" and that, as a result, "defendant's consent to the search was irrelevant." 45 Or App 911, 919, 609 P2d 438 (1980). Four members of that court dissented. We allowed the state's petition for review.

THE FACTS

Officer McLaughlin of the Portland Police Department, Narcotics Detail, received a telephone call from Detective Berks of the Fort Lauderdale, Florida, sheriff's office. Detective Berks informed Officer McLaughlin that two men who fit a "drug smuggler's profile" had boarded a plane for Portland. Detective Berks related to Officer McLaughlin a description of the men and a description of their conduct in relation to the "drug smuggler's profile" that had led Detective Berks to suspect that they were carrying narcotics.

After verifying the identity of Detective Berks, Officer McLaughlin and five other officers then went to the Portland Airport to intercept the two suspects. The officers observed two men matching the descriptions given by Detective Berks, one of whom was the defendant, disembark from the flight from Fort Lauderdale. The officers then followed the suspects from the gate area where they had disembarked through the baggage and ticket areas and out to the end of the terminal building. At that point defendant's companion left defendant.

As defendant proceeded toward the parking lot Officer Johnston approached defendant and said, "Excuse me sir. May I talk to you?" Defendant hesitated for a moment and then said, "Do you want to talk to me?"

Officer Johnston displayed his badge, identified himself as a police officer and gave his name. One other officer was also present.[1] Defendant then asked Johnston why the officer wanted to talk with him. Johnston informed defendant that he "had information that led [him] to believe that [defendant] may be carrying narcotics on his person or in his luggage." Defendant denied that he was carrying narcotics and said, "Would you like to search my luggage?" Johnston had not made any request for consent to search defendant or his luggage.

Before searching defendant's handbag, Officer Johnston frisked him for weapons. Johnston then searched defendant's handbag and found a small glass vial, empty on the inside, but which had a white powder along the threads, identified by Johnston as cocaine, and a razor blade with masking tape over the edge. Defendant denied knowing how the vial got into his luggage. That vial was the subject of defendant's motion to suppress.

These facts, together with the contentions of the parties, present three questions:

(1)   Did the encounter between the police and defendant at the airport constitute a "stop" within the meaning of ORS 131.605(5)?

(2)   If the encounter between the police and defendant constituted a "stop" within the meaning of ORS 131.605(5), did use of so-called "drug profile" information provide the police with "reasonable suspicion" so as to justify the "stop" according to ORS 131.615(1)?

(3)   If the encounter between the police and defendant was a "stop" unjustified by reasonable suspicion, was the search so "tainted" by the unjustified "stop" as to be illegal despite defendant's consent, or was defendant's consent sufficiently voluntary to validate the search?

Before addressing these questions it should be noted that some ambiguity exists as to the grounds upon which defendant seeks relief. Defendant does not cite or appear to rely upon relevant search and seizure provisions of the Oregon Constitution (Article I, § 9) or the United

---

[1] Although six officers went to the Portland airport to intercept defendant and his companion, only two were present during the initial encounter with defendant. Officer McLaughlin had left to follow defendant's companion.

States Constitution (the Fourth and Fourteenth Amendments) but appears to rely solely upon ORS 131.605-131.625. This court has recognized, however, that those statutory provisions were intended to be in part a codification of decisions by the United States Supreme Court and Oregon Supreme Court interpreting those constitutional provisions, and that the purpose of the statutory provisions is to protect interests of the kind which are protected by the Fourth Amendment of the United States Constitution and by Article I, § 9 of the Oregon Constitution. *See State v. Valdez,* 277 Or 621, 625, 629, 561 P2d 1006 (1977). Therefore, analysis of defendant's rights under ORS 131.605-131.625 is substantially the same as analysis of his rights under the search and seizure provisions of the Oregon and Federal constitutions.

1. *The validity of the initial encounter.*

In *State v. Warner,* 284 Or 147, 161, 585 P2d 681 (1978), this court recognized three kinds of "encounters" between police and citizens: (1) an arrest, justified only by probable cause; (2) a stop, i.e., "a temporary restraint of a person's liberty," ORS 131.605(5), which is justified by reasonable suspicion that the person has committed a crime, ORS 131.615(1); and (3) "mere conversation" (questioning without restraint of liberty), which needs no justification.

Defendant does not contend that he was under arrest in this case. He does contend, however, that his encounter with Officer Johnston constituted a "stop" and one without reasonable suspicion. The state contends, to the contrary, that the encounter was that of the third kind, a "mere conversation," and therefore did not need to be justified by reasonable suspicion. In the alternative, the state contends that even if the encounter was a "stop," the "drug profile" provided the officers with reasonable suspicion for the "stop."

The Court of Appeals found that Officer Johnston, by identifying himself, displaying his badge and informing defendant that he was suspected of carrying narcotics, had restrained defendant's liberty and thereby made a "stop." 45 Or App at 915. The court further found that the characteristics of the "drug smuggler's profile" upon which the

police based their stop of defendant did not provide reasonable suspicion to justify the stop. *Id* at 919.

ORS 131.605(5) defines a stop as:
> "* * * a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

In *Warner, supra,* this court interpreted ORS 131.605(5) to mean that for purposes of determining whether a "stop" has occurred, it suffices that a person's liberty is restrained by either physical force or by a show of authority. 284 Or at 162.

Determination of whether a "stop" has occurred will depend largely upon the particular facts of each case. *See* 284 Or at 149. It is clear, however, that a police officer may approach a citizen, identify himself as an officer and ask some preliminary questions without making a "stop." This is consistent with *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 LEd 2d 889 (1968), in which the United States Supreme Court appeared to hold, at least in effect, that such a police-citizen encounter as just described does not amount to a "seizure" within the meaning of the Fourth Amendment.[2] Because ORS 131.605(5) is based in part upon *Terry (see* Commentary, Proposed Oregon Criminal Code of 1972 at 24 (1972)), that Oregon statute should also be given an interpretation consistent with *Terry.*

---

[2] In *Terry* the Court stated in a footnote:

> "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred. We cannot tell with any certainty upon this record whether any such 'seizure' took place here prior to Officer McFadden's initiation of physical contact for purposes of searching Terry for weapons, and we thus may assume that up to that point no intrusion upon constitutionally protected rights had occurred." 392 US at 19 n. 16.

The facts in *Terry* indicate that Officer McFadden had "approached the three men, identified himself as a police officer, and asked for their names." 392 US at 6-7. Those facts, read together with footnote 16 of the opinion, appear to hold that the show of authority and accompanying restraint that occurs simply by a police officer identifying himself as such to a citizen and asking preliminary questions does not constitute a "stop." *See also* 3 W. LaFave, Search and Seizure at 48 (1978), in which, after reviewing United States Supreme Court "stop" cases, it is stated that:

> "The one point which emerges most clearly is that there are at least some situations in which a person known to be a police officer may put questions to another person without that constituting a 'seizure' within the meaning of the Fourth Amendment."

It is unnecessary, however, to decide whether the facts of this case and, in particular, the fact that Officer Johnston informed defendant that he was suspected of carrying narcotics, were such as to constitute a "stop." It is also unnecessary to decide whether the "drug smuggler's profile" provided reasonable suspicion to justify a stop of defendant.[3] Assuming, without deciding, that the "encounter" between defendant and the police officers was a "stop" that was not justified by reasonable suspicion, we believe that defendant's consent to the search was nevertheless voluntary in light of all the facts, and that as a result of that voluntary consent the evidence found as a result of the search was admissible regardless of whether the stop was unjustified.

## 2. *The validity of defendant's consent.*

In considering the validity of defendant's consent in its relation to the question whether the search based upon that consent was illegal so as to require suppression of the evidence discovered by that search, we must recognize, as stated in *State v. Douglas,* 260 Or 60, 67, 488 P2d 1366 (1967) that:

"We start, of course, with the recognition that the Fourth Amendment of the Constitution of the United States does not prohibit *all* searches and seizures, but only *'unreasonable* searches and seizures.' It follows that 'standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application.'"

---

[3] ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

A considerable number of cases have recently addressed the issue of whether use of a "drug profile" can provide reasonable suspicion sufficient to justify a stop. The majority of cases have held or stated that use of a "drug profile" by itself was insufficient to justify a stop. *See Reid v. Georgia,* 448 US 438, 65 LEd 2d 890, 100 S Ct 2752 (1980); *United States v. Buenavista-Aziza,* 615 F2d 29 (2d Cir 1980); *United States v. Rico,* 594 P2d 320 (2d Cir 1979); *United States v. Smith,* 574 F2d 882 (6th Cir 1978); *United States v. Ballard,* 573 F2d 913 (5th Cir 1978); *United States v. Pope,* 561 F2d 663 (6th Cir 1977); *United States v. McCaleb,* 552 F2d 717 (6th Cir 1977); *United States v. Coleman,* 450 F Supp 443 (1978); *State v. Mitchell,* 377 So 2d 1006 (Fl Ct App 1979); *State v. Brown,* 370 So 547 (La 1979); *State v. Matthews,* 366 So 2d 1348 (La 1978); *State v. Washington,* 364 So 2d 958 (La 1978).

Two recent Fifth Circuit decisions, however, have found reasonable suspicion to exist primarily on the basis of "drug profiles." *See United States v. Fry,* 622 F2d 1218 (5th Cir 1980); *United States v. Bowles,* 625 F2d 526 (5th Cir 1980).

We must also recognize, as recently held in *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981), that:

"* * * the exclusionary rule of search and seizure should be applied only as broadly as is necessary to accomplish its protective and prophylactic purposes. *State v. Nettles,* 287 Or 131, 597 P2d 1243 (1979). *See State v. Scharf,* 288 Or 451, 461 n. 10, 605 P2d 690 (1980). The device of excluding trustworthy evidence from the factfinding process in order to serve higher purposes 'is a needed, but grudgingly taken medicament; no more should be swallowed than is needed to combat the disease.' Amsterdam, *Search, Seizure, and Section 2255,* 112 U Pa L R 378, 389 (1964)."

This court has also held, based upon decisions by the Supreme Court of the United States, that searches conducted without a warrant are "per se unreasonable, subject to a few specifically established and well-delineated exceptions," and that "one of these 'exceptions' is that of so-called 'consent searches.'" *State v. Douglas,* 260 Or 60, 68, 488 P2d 1366 (1971). *See also Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 LEd 2d 854 (1973), and *State v. Greene,* 285 Or 337, 340-41, 591 P2d 1362 (1979). In this case, however, the Court of Appeals apparently believed that any consent given subsequent to an illegal "stop" is "irrelevant," with the result that it could not properly consider the question of whether defendant's consent to the search in this case was given voluntarily. We disagree.

The United States Supreme Court has held that the existence of a police illegality does not automatically require suppression of evidence discovered subsequent to that illegality. In *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 LEd 2d 441 (1963), the Court rejected a "but for" test which would require that evidence must be suppressed if it would not have been discovered "but for" the illegal police actions. Instead, the Court said:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 US at 487-88.

The above reasoning has been applied to a number of cases such as this in which consent to a search is given during or after an alleged police illegality. Courts have consistently held that evidence discovered by such a search is not to be automatically suppressed as "fruit of the poisonous tree," but instead have stated that the evidence is to be suppressed only if it is found that the consent was gained by exploitation of the illegality or that defendant's free will was tainted by the illegal police conduct. *See, e.g., United States v. Troutman,* 590 F2d 604 (5th Cir 1979); *United States v. Ballard,* 573 F2d 913 (5th Cir 1978); *St. John v. State,* 363 So 2d 862 (Fl App 1978); *McShan v. State,* 150 Ga App 232, 257 SE 2d 202 (1979); *State v. Zielman,* 384 So 2d 359 (La 1980); *State v. Kissner,* 252 NW 2d 330 (SD 1977). *See also* 2 W. LaFave, Search and Seizure 649-55 (1978).

In *State v. Quinn, supra,* this court applied the same analysis. In that case police sought defendant's consent to a search as the result of observations made by the officers during a prior illegal search. We found, however, that despite that illegality defendant's consent to the second search was voluntary and that the evidence discovered during that search was admissible.

This court applied essentially the same analysis in *State v. Warner, supra,* involving facts somewhat similar to those in this case. There we found that defendant had been illegally "stopped" by police. However, the court did not hold that the illegality alone required suppression of evidence discovered during a search to which defendant consented after the illegal "stop" had occurred. Instead, this court examined the totality of the facts and circumstances at the time of the consent to see whether it was voluntary.

The Court of Appeals was, therefore, in error in its holding that any consent by defendant was "irrelevant" if it occurred during an illegal stop. Instead, the proper approach in this case is to examine the totality of the facts and circumstances and to determine, based upon that examination, whether defendant's consent to the search was voluntary. Before doing so, however, it is necessary to consider both the burden of proof and the scope of review by this court in such a case.

When the state relies upon consent as the basis for a search, we have said that the state must prove the validity of the consent by "clear and convincing" evidence. *Douglas, supra* at 68.[4] This court's scope of review regarding voluntariness of consent has been stated in *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), and *State v. Warner, supra.* In those cases this court held that an appellate court is not bound by a trial judge's finding of voluntariness of consent if the appellate court finds that the historical facts are insufficient to satisfy constitutional standards of due process.

In this case, although the trial court made no findings as to the historical facts, those facts are not in dispute. The only express finding by the trial judge on the issue of consent was that defendant's consent to the search was valid. The state contends that this court is bound by that finding under *Warner* and *Ball.* When that finding was made, however, the trial judge had ruled not to suppress the evidence. The trial judge subsequently changed his mind and ordered the evidence suppressed. In doing so he made no mention of the question of consent, but apparently based his new holding upon the belief that the illegality of the stop required suppression of the evidence. We must thus determine from the undisputed historical facts whether defendant's consent to the search was given voluntarily.

██ As previously stated, the proper test for determining the validity of consent to a search is to examine the totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied. *Schneckloth v. Bustamonte,* 412 US 218, 226-27, 93 S Ct 2041, 36 LEd 854 (1973). It has generally been recognized, however, that even though a "totality of circumstances" approach is to be applied in testing consents given after illegal police conduct as well as in testing consents given where police conduct has been proper, the burden on the police to show voluntariness when consent occurs after illegal police conduct is greater than when no illegality has occurred. *See, e.g., United*

---

[4] *But see* ORS 133.693(4) and *State v. Warner,* 284 Or 147, 160 n. 3, 585 P2d 681 (1978).

*States v. McCaleb,* 552 F2d 717 (6th Cir 1977); *United States v. Ballard,* 573 F2d 913 (5th Cir 1978); 2 W. LaFave, Search and Seizure 650 (1978).

The two primary cases in which this court has examined the historical facts for voluntariness of consent have been *State v. Warner, supra,* and *State v. Douglas, supra.* In *Warner* this court found that defendant's consent, which occurred after an illegal stop, was not voluntary. In making that finding this court took particular note of the fact that six police officers and three marked police cars were present when the officers made a request that defendant consent to the search.

In *Douglas,* which did not involve illegal police conduct, this court found that the historical facts supported the trial judge's finding of voluntary consent. In that case several police officers were in defendant's apartment for half an hour prior to the time consent was given. They asked defendant at least once for consent to search and defendant declined. Defendant was also told that the police would make an effort to get a warrant.

Despite these facts this court found from the totality of the facts and circumstances that defendant's consent was voluntary. Of special significance in arriving at that finding was the fact that defendant testified that his brother-in-law's encouragement to consent to a search was what finally prompted him to do so, and that defendant not only gave verbal consent to the search but opened the suitcase himself on two different occasions and dumped out the contents.

In examining the totality of the facts and circumstances in this case in light of our holdings in *Warner* and *Douglas,* we believe that defendant's consent was voluntary. We believe this to be true even under the more strict standard of review to be applied in cases involving illegal police conduct and under the assumption that the "stop" in this case was improper.

The facts that were emphasized by this court in *Warner* as indicating an involuntary consent, i.e., the presence of numerous officers and marked police cars, are absent in this case. Here only two plainclothes officers were

present at the time consent was given. Similarly, we find the facts in this case much less coercive than those in *Douglas,* in which we upheld the validity of the consent. Here there were no repeated efforts by the police to obtain consent nor statements by them that a warrant would be sought. The encounter between Officer Johnston and defendant lasted only moments before defendant suggested the search, while the police contact with defendant in *Douglas* prior to consent was about half an hour. We also note that in *Douglas* defendant was approached in his motel room, while in this case it was in a public corridor at an airport.

Examining the "totality" of the facts and circumstances, we find an almost total absence of coercive factors in this case. Only two officers talked with defendant. The limited conversation between defendant and police was very polite, with Officer Johnston addressing defendant as "sir" and saying "excuse me" before requesting to speak with defendant. The police informed defendant that he was suspected of carrying narcotics only upon inquiry by defendant. The police made no requests of defendant of even a minimal nature, such as to ask him to accompany them to a private room. Taken together, the police action in this case involved no conduct that would in any way coerce defendant or act upon his free will, except that which might flow from the encounter itself.

Most importantly, we believe that defendant's offer to let Officer Johnston search his luggage without a prior request for such consent is a strong indication that defendant's free choice was not tainted by the illegal stop when consent was given, although volunteering of consent may not be conclusive. We noted in *Douglas* that defendant's willingness to open the suitcase, in addition to giving verbal consent, indicated that defendant acted voluntarily in that case. This defendant's offer of verbal consent to search his handbag by the statement "Would you like to search my luggage?" must be recognized as even more significant.

Other courts have also held that such a volunteering of consent without a prior request from police is a strong indication of voluntariness. *See, e.g., United States v.*

Petty, 601 F2d 883, 889-90 (1979); *State v. Fortier,* 113 Ariz 332, 553 P2d 1206, 1209-10 (1976); *People v. Superior Court of Los Angeles County,* 86 Cal App 3d 366, 372-73, 150 Cal Rptr 227 (1979); *State v. Baker,* 338 So 2d 1372, 1374 (La 1976); *Commonwealth v. Cantalupo,* 402 NE 2d 1040, 1044 (Mass 1980).

The facts in two of these cases are similar to the facts of this case in that a defendant volunteered consent to search after an illegal stop had occurred. In *State v. Fortier, supra,* the Arizona Supreme Court held that a police officer had unlawfully stopped defendant's car. During the stop the officer asked defendant whether he had keys to the trunk of the car, the purpose being to see if the defendant had a full set of keys. On his own initiative, however, the defendant went and opened the trunk. In holding that evidence discovered in the trunk was not to be suppressed, the court emphasized that defendant "voluntarily opened the trunk of the car * * * without a request to do so by the officer." Under these facts it was held that defendant acted voluntarily and that the evidence was obtained under facts sufficient "to be purged of the primary taint" from the illegal stop. 553 P2d at 1209-10.

A similar result was reached in *State v. Baker, supra.* In that case police stopped defendant's car after they observed erratic behavior. When an officer peered into the car, defendant stated "Go ahead and search [the car] because I ain't got nothing to hide. You got my permission to search it." The Louisiana Supreme Court held it was unnecessary to reach the issue of the validity of the stop, because even assuming that the stop was illegal there was no exploitation of the illegality. The court stated that the defendant's consent was voluntary, emphasizing that it was "volunteered, unequivocal and specific." 338 So 2d at 1374.

In considering the question whether defendant's consent to the search was voluntary, we also find it to be significant that the only evidence discovered in defendant's handbag was a small glass vial, empty on the inside, but which was found to have cocaine along the "threads." Defendant may well have invited the search in the belief that no incriminating evidence would be found. Other

courts have held that circumstances indicating that the consenting party believed no incriminating evidence would be found in a search is a proper factor for consideration in determining whether consent to the search was voluntary. *See, e.g., State v. Niemszyk,* 303 A2d 105, 109 (Me 1973), and *Humphrey v. State,* 39 Md App 484, 386 A2d 1238, 1242 (1978).

In sum, upon consideration of the totality of these facts and circumstances, we hold that defendant's consent to the search of his luggage was voluntary. In so holding we note again the absence of any coercive circumstances surrounding defendant's consent, and defendant's volunteering of consent, with no request by the police.[5] Even applying the more strict standard of scrutiny to be applied in cases involving illegal police conduct, we believe that this defendant acted of his free will when he said to Officer Johnston, "Would you like to search my luggage," and that as a result of this voluntary "invitation to search" the evidence found by that search was admissible regardless of whether there had been a previous illegal stop.

For these reasons, we hold that the trial court and the Court of Appeals were in error in holding that defendant's motion to suppress should have been allowed and we remand this case for trial.

Reversed and remanded.

---

[5] In finding as we do that defendant's consent was voluntary, we do not believe that Officer Johnston's subsequent frisk of defendant has any bearing on the validity of that consent. Although the frisk may have been a violation of ORS 131.625(1), which allows a frisk only if an officer reasonably suspects a person is armed and dangerous, the frisk is irrelevant in this case for two reasons: First, defendant has not contended that the frisk was a violation of his rights. Second, assuming that the frisk violated defendant's rights, no evidence was secured in any way by the frisk, and there was, therefore, no "exploitation" of that illegality. Rather, the evidence was discovered by an entirely independent source, defendant's volunteering of consent to a search, and, therefore, was not "fruit of the poisonous tree." *See Wong Sun v. United States, supra.*