**Leonard WOODBERRY, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 07–92–0286–CR.**

Court of Appeals of Texas,
Amarillo.

April 16, 1993.

Opinion Overruling Motion for
Rehearing July 1, 1993.

Ron Hance, Lubbock, for appellant.

Lubbock County Dist. Attorney's Office, Travis W. Ware, Michael West, Lubbock, for appellee.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

POFF, Justice.

Appellant Leonard Woodberry appeals from a conviction of aggravated robbery. After appellant's motions to suppress were denied, he plead guilty to the offense and reserved the right to appeal the denial of his pre-trial motions. The court assessed punishment at seven years confinement in the Texas Department of Criminal Justice, Institutional Division and a $1,000 fine.

Appellant challenges the trial court's denial of one of his motions to suppress in which he sought to exclude from evidence several items obtained in a search of his private room. In his first point of error, appellant contends that his.arrest was illegal and that, therefore, the items obtained by police in their search of his room are fruits of the poisonous tree and inadmissible. In his second point of error, appellant argues that a search of his private room was not rendered permissible by a third party's consent. We will sustain point of error two, reverse the judgment of the trial court and remand the cause for a new trial.

A brief recitation of the facts is necessary. At 9:39 p.m. on December 2, 1991, Officer Loyd Bullock of the Lubbock Police Department received a police radio dispatch that a robbery had just occurred at the Bolton Service Station located on the corner of 38th and Avenue Q in Lubbock. Bullock immediately drove to the area of 38th and Avenue P because the dispatcher had broadcast the fact that the robber was named David and lived in some apartments in that area. The robber was initially described as a black male wearing black sweats with something on his head covering his face. He was reportedly armed with a small black pistol. Bullock arrived in the area at 9:42 p.m.

After driving around the area for about two minutes, Bullock stopped his car at the entrance to a parking lot located in the same block as the service station where the robbery occurred. Bullock testified that he stopped his car because he saw that a

> yellow Buick Regal was fixing to pull out of this drive area onto 38th Street. It had two black males in it. I was fixing to just go ahead and pull off. And at that time, Sergeant Sanders, which was at the crime scene, had started giving a description that there was two suspects instead of one.[1] He started giving a clothing description, so I started observing them. They was looking around. I couldn't tell if they was just extremely nervous or if they was just wanting to see what all was going on because there was police all over the area. But they started matching the clothing description, so I continued to watch them.

Bullock testified that according to Sergeant Sanders' report, the two suspects were black. One was wearing gray sweats and

---

**1.** A witness other than the victim had provided information that the actual robber was accompanied by another black male.

the other was wearing black sweats. When the two men pulled out of the parking lot, Bullock activated his blue and red emergency lights and pulled them over.

Bullock then approached the vehicle along with Officer Scott Weems who was also in the area looking for suspects. Bullock noticed that the man in the passenger seat "had some quantity of currency bills sticking out from underneath his left leg and laying partially on the seat." He also observed that the passenger was spitting up phlegm and "was having an extremely hard time breathing, as if he had run quite a distance." Bullock testified that this led him to believe that the passenger had just been running in the cold (33 degree) weather. Bullock asked the men to wait in their car for "just a second" while he retreated slightly to receive an updated description of the robbers from Sergeant Sanders. Believing that he had stopped the robbers, Bullock suggested that the victim of the robbery be brought to where the suspects were stopped in order to identify them. Sergeant Sanders agreed to bring the victim to Bullock's location.

Bullock then returned to the yellow Buick and asked the two occupants to step out. The two men obliged and a very short time later the robbery victim arrived. The victim, who had only seen one robber, identified the passenger of the vehicle, David Scott, as the person who had just robbed him. The police then placed both Scott and the driver of the vehicle under arrest. The driver of the vehicle was Leonard Woodberry, appellant in this case.

Scott and appellant informed Officer Bullock and Sergeant Sanders that they both lived in a duplex at 1601 38th Street. While other police officers transported Scott and appellant to the police station, Bullock and Sanders proceeded to the duplex where they met Scott's wife at the door. The officers explained to Mrs. Scott what had happened and requested permission to "search the house for a pistol and any other evidence of the robbery." After telephoning her mother, Mrs. Scott consented to the search of the entire house by signing a consent-to-search form. Mrs.

Scott informed the officers prior to their search that appellant lived in one bedroom of the duplex and that he paid a monthly rent for the room. Mrs. Scott also told the officers that she had access to clean and maintain appellant's room. The door to appellant's room was open when the officers arrived. Sergeant Sanders searched appellant's room while Officer Bullock searched the rest of the house. Although Bullock's search revealed nothing noteworthy, Sanders found a loaded .32 caliber Smith & Wesson revolver with black plastic grips placed haphazardly under the bed. Sanders also found a pair of white cotton socks underneath a pillow on the unmade bed. The socks were significant to Sanders because one of the suspects had been described by the robbery victim as having white socks on his hands. Sanders felt it was unusual for a pair of socks to be found under a pillow. Additionally, Sanders found a black sweatshirt in a chair just inside appellant's room.

By virtue of his motion to suppress, appellant sought to exclude the gun, the socks and the shirt from evidence. The trial court denied appellant's motion. Our task is to review the propriety of the trial court's ruling.

In his first point of error, appellant argues that his arrest was illegal and that, therefore, the items obtained in the search of his room are fruits of the poisonous tree and inadmissible. We find the arrest to have been legal but we need not expound upon this point for the legality of the arrest is of no moment in determining whether the trial court correctly denied appellant's motion to suppress.

■ If, as the State contends, the arrest was constitutionally permissible, the police would still have had no right to search appellant's room without a warrant or without consent. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to arrest is limited to the arrestee's person and the area within his immediate control). Similarly, even if, *arguendo,* the arrest was in contravention of our state and federal constitutions, the police could still have obtained

consent to search appellant's room and such search would not have been a fruit of the poisonous tree.

■ As explained in the seminal case of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the fruit-of-the-poisonous-tree doctrine excludes as direct evidence not only the direct products but also the indirect products of Fourth Amendment violations. However, evidence is not classified as a fruit requiring exclusion merely because it would not have been discovered "but for" the violation.[2] The Supreme Court has instructed that

> the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* at 488, 83 S.Ct. at 417. Voluntary consent to a search establishes that items obtained pursuant to such a search are not seized by exploitation of the illegal government action, but rather by means so attenuated from the illegal action as to dissipate the primary taint. *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.1990); *United States v. Fike*, 449 F.2d 191, 193–94 (5th Cir.1971); *State v. Fortier*, 113 Ariz. 332, 553 P.2d 1206, 1209–10 (1976); *People v. Sesslin*, 68 Cal.2d 418, 67 Cal.Rptr. 409, 416, 439 P.2d 321, 328 (1968); *State v. Kennedy*, 290 Or. 493, 624 P.2d 99, 103–04 (1981). *"Notwithstanding an illegal arrest,* one of the recognized exceptions to the requirement of both a warrant and probable cause for a valid search is a search authorized by consent freely and voluntarily given." *Myers v. State*, 680 S.W.2d 825, 827 (Tex.App.—Amarillo 1984, pet. ref'd) (emphasis added). *See also Juarez v. State*, 758 S.W.2d 772, 776 (Tex.Crim. App.1988). The dispositive question before us in this appeal is whether the police received valid consent to search appellant's private room. Accordingly, we move on to

a discussion of appellant's second point of error.

■ It is well settled that a search violates no federal or state constitutional strictures if it is conducted pursuant to effective consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860 (1973); *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Crim.App. 1976). It is equally well established that the burden is on the prosecution to show by clear and convincing evidence that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968); *Kolb v. State*, 532 S.W.2d at 89. The question of whether a consent to search was voluntary is to be determined from the totality of all the circumstances. *Kolb v. State*, 532 S.W.2d at 90.

In the instant case, appellant does not contend that the consent to search given by Mrs. Scott was anything other than freely and voluntarily given. Rather, appellant argues that Mrs. Scott "did not have authority to consent for [appellant] to the search of that portion of the residence devoted to his exclusive use." We agree.

In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the constitutional validity of third-party consent searches was affirmed:

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who *possessed authority over or other sufficient relationship to the premises or effects sought to be inspected.*

*Id.* at 171–72, 94 S.Ct. at 993 (emphasis added). In a footnote, the Court declared that the authority justifying third-party consent rests

> on mutual use of the property by persons generally having joint access or control *for most purposes,* so that it is reasonable to recognize that any of the coinha-

<hr>

2. In this case, but for the arrest of appellant and Scott, the police would not have learned where appellant and Scott lived. Without such knowl-

edge, the police obviously would not have known to go to their duplex and seek consent to search.

bitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7 (emphasis added).

In the case at bar, the State has failed to show by clear and convincing evidence that Mrs. Scott possessed authority over appellant's room sufficient to consent to its search. Mrs. Scott had access to the room only for the purpose of cleaning. It can in no way be said that Mrs. Scott had joint access or control over appellant's room "for most purposes." The relationship between Mrs. Scott and appellant is analogous to the relationship between a hotel maid and a hotel occupant. "[W]hen a person engages a hotel room he undoubtedly gives implied or express permission to such persons as maids, janitors or repairmen to enter his room in the performance of their duties." *Stoner v. California,* 376 U.S. 483, 489, 84 S.Ct. 889, 11 L.Ed.2d 856, 861 (1964). However, the owner or manager of the hotel has no such permission to enter the room, and thus an owner or manager may not validly consent to the search of the guest's room. *Id.* at 487–89, 84 S.Ct. at 891–92. Similarly, a landlord has no authority to consent to a search of premises occupied by a tenant. *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). Mrs. Scott stands in the same position as the hotel manager and the landlord—she had no authority to validly consent to a search of appellant's room. "[T]he rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" *Stoner v. California,* 376 U.S. at 488, 84 S.Ct. at 892.

This record does not show that the search of appellant's private room was conducted pursuant to valid consent. The trial court erred in denying appellant's motion to suppress evidence obtained by the police in their unconstitutional search of appellant's room. Point of error two is sus-

tained. The judgment of the trial court is reversed and the cause is remanded for a new trial.

## ON MOTION FOR REHEARING

In its motion for rehearing, the State contends that we erred in holding that the trial court erred in denying appellant's motion to suppress. Additionally, the State contends that even if the court erred in denying the motion to suppress, the error was harmless. We have considered the State's motion and the appellant's reply and based on the following rationale, the motion will be overruled.

On rehearing, the State argues we incorrectly concluded that Ms. Scott, the lady from whom appellant rented his room, had access to his room "only for the purpose of cleaning." The State contends there was evidence before the trial court that Ms. Scott had "complete access" to appellant's room. Under the State's reading of the record, the evidence of "complete access" refutes the appellant's evidence that Ms. Scott only entered his room to clean. Therefore, the State contends there was a conflict in the evidence and this Court should have accepted the trial court's finding that Ms. Scott was authorized to consent to the search of appellant's room. Thus, the State concludes, we erred in not affirming the granting of the motion to suppress.

Once again, we read the record differently than does the State. We find no factual evidence from the State that Ms. Scott had "complete access" to appellant's room. In its motion for rehearing, the State concedes that even though Ms. Scott was free to enter appellant's room at any time, as a practical matter she only did so to clean. The State contends that Ms. Scott revealed these matters via Officer Bullock, one of the officers who conducted the search of appellant's room.[1] In answer to the State's inquiry, Officer Bullock testified:

Q. "Okay. And did Ms. Moore (Scott) have complete access to that room?"

A. "She advised us that she did."

---

1. Ms. Scott did not testify on behalf of the State.

This inquiry reveals the State was aware of the necessity for showing Ms. Scott's equal control of appellant's room. The answer however, fails to give a factual basis for the conclusion and opinion that Ms. Scott had "complete access" to appellant's room. We fail to find such a bare conclusion to be an evidentiary basis for a finding of control.

A more revealing question and a response more evidentiary in nature was propounded to Officer Bullock by appellant's counsel:

> Q. "You did hear her (Ms. Scott) say to Officer Saunders that I have the right or I do go in and clean up the room occasionally, did she not?"
>
> A. "Yes sir."

At the motion to suppress hearing, the appellant consistently denied that Ms. Scott had an equal right to use or occupy his room. While there was evidence Ms. Scott had access to clean appellant's room "when she got ready", such access can not be deemed to be an equal right or sufficient joint control to enable her to consent to a search of appellant's room.

Having found the court erred in denying the motion to suppress, we address the State's contention that the error was harmless under Rule 81(b)(2) of the Texas Rules of Appellate Procedure.

██ In its motion for rehearing, the State contends that even if the trial court erred in denying appellant's motion to suppress, such error was harmless. The State argues that the trial court's denial of appellant's motion to suppress was harmless because following the denial, appellant pleaded guilty to the offense charged. In compliance with Tex.Crim.Proc.Code Ann. art. 1.15 (Vernon Supp.1993), the State offered sufficient proof to support the plea by means of appellant's judicial confession. The State did not have to offer the evidence taken from appellant's room to show appellant's guilt. Therefore, the State contends that any error in denying appellant's motion to suppress the items taken from his room was harmless. We do not agree.

██ As recognized in *Morgan v. State*, 688 S.W.2d 504 (Tex.Crim.App.1985), when a defendant's motion to suppress evidence is denied, his subsequent judicial confession is literally a fruit of the contested search or seizure. *Id.* at 507 n. 2. A judicial confession given after the denial of a motion to suppress will not bar an appellate court from reaching the merits of a defendant's claim that the denial was erroneous. *Id.* at 507. If the appellate court finds that the trial court erred in denying the defendant's motion to suppress, it must be determined whether the evidence sought to be suppressed "has somehow been 'used' in securing the defendant's conviction." *McKenna v. State*, 780 S.W.2d 797, 799 (Tex.Crim.App.1989). If so, the erroneous denial is harmful error.

In *McKenna*, the Court of Criminal Appeals noted that a trial court's denial of a defendant's motion to suppress evidence "undoubtedly contributes in some measure to the State's leverage in the plea bargaining process [because] the more relevant evidence [the defendant] knows [can] be marshalled against him, the more preferable would appear his option to relinquish constitutional rights of trial and confrontation in exchange for a favorable punishment recommendation." *Id.* at 799 (quoting *Kraft v. State*, 762 S.W.2d 612, 614 (Tex.Crim.App.1988)). In such a situation it may be presumed that the State has "used" the contested evidence to obtain the defendant's plea. *Id.*

In the present case, the State obtained a ruling that the gun, socks, and sweatshirt appellant sought to suppress would be admissible at trial. We find that the trial court's ruling "undoubtedly contributed in some measure to the State's leverage in the plea bargaining process", *id.*, and may well have contributed to appellant's decision to relinquish his rights and plead guilty. In our view, the evidence sought to be suppressed was "used" in obtaining appellant's confession. Accordingly, it can in no wise be said that the trial court's error in denying appellant's motion to suppress was harmless. *See* Tex.R.App.P. 81(b)(2) ("If the appellate record in a criminal case reveals error in the proceedings below, the

appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or the punishment").

Finding that the court committed error in denying the motion to suppress and having found that the error was not harmless, we overrule the motion for rehearing.