Argued and submitted March 11, order of circuit court affirmed July 24, 2003

# STATE OF OREGON,
*Appellant,*

*v.*

# JESSE L. JOHNSON,
*Respondent.*

## (CC 98C46239; SC S49843)

73 P3d 282

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jesse Wm. Barton, Salem, argued the cause and filed the brief for respondent.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.

GILLETTE, J.

**GILLETTE, J.**

In this aggravated murder case, the state appeals from a pretrial ruling that suppressed certain evidence.[1] The police seized the evidence in question pursuant to a warrant. The issue before us is whether the trial court erred in suppressing that evidence on the ground that the seizure was tainted by an earlier, unlawful seizure of the same evidence. For the reasons that follow, we conclude that, on the record before us, the trial court did not err.

The underlying charge involves the death of Harriet Thompson, who was stabbed to death in her home on or about March 20, 1998. (The uncertainty relates to whether the victim was killed before or after midnight on March 19.) The victim's body was found on the living room floor of the home. Someone apparently had stepped in the victim's blood and then tracked the blood on the floor. The track included a partial shoe sole impression that appeared to have been made by a heavy, lug-type work boot.

The police became interested in defendant as a suspect when an acquaintance of the victim identified defendant from police photographs as a person who had been in the victim's home on the day before the murder. Police investigators obtained defendant's fingerprint records from previous arrests. A technician then determined that two fingerprints found at the scene of the crime (on an overturned vase and on a $5.00 bill) matched defendant's fingerprints. Investigators also learned, around the same time, that a witness had seen a man who roughly matched defendant's description walking away from the victim's residence in the early morning hours of March 20. According to that witness, the man he saw was wearing a denim jacket and acid washed denim jeans.

The police found defendant and arrested him òn an unrelated probation violation warrant on March 27, 1998.

---

[1] The appeal comes directly to this court under ORS 138.060(2), which became effective on July 31, 2001. Or Laws 2001, ch 871, § 34. That statute provides that, if the state chooses to appeal from a pretrial order suppressing evidence in an aggravated murder prosecution, the state shall take its appeal from the circuit court directly to the Supreme Court.

That arrest occurred at the home of defendant's girlfriend, McDowell. Defendant was only partially dressed when the officers arrested him; they allowed him to dress before taking him to the police station. Defendant put on, among other things, acid-washed jeans and a pair of heavy work boots. One of the arresting officers noticed that the design of the boots' soles was "consistent" with the partial boot print found at the murder scene.

At the Salem Police Department, detectives interviewed defendant concerning the Thompson murder. Defendant admitted to knowing the victim but denied ever having been at her house, maintaining that position even when confronted with the fact that his fingerprints had been found on objects in the victim's home.

After the interview, the detectives seized defendant's clothing and boots and placed them in an evidence locker. They then booked defendant into the Yamhill County Jail on the probation violation charge. There is no contention that defendant also was under arrest for murder at that time.

Two months later, as defendant was being released in the probation matter, Salem police charged him with the Thompson murder and booked him at the Marion County Jail. Defendant ultimately was indicted for murder, aggravated murder, and robbery. Defendant subsequently moved to suppress the clothing and boots that police detectives had seized at the police station. He argued that the seizure violated Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, because the police carried out the seizure without a warrant and no exception to the warrant requirement justified the seizure.

■ ■ The state responded that the seizure was lawful because it fell under certain recognized exceptions to the warrant requirement, including the "exigent circumstances" exception. The state also argued that, even if the seizure was unlawful, suppression was not justified, because the police inevitably would have discovered and seized the items in question through lawful means.[2] In support of that "inevitable discovery" argument, the state pointed to testimony by a

---

[2] The "inevitable discovery" doctrine "permits the prosecution to purge the taint of illegally obtained evidence by proving, by a preponderance of the evidence,

police detective that, if the detectives had not seized defendant's clothes as evidence at police headquarters, then the clothes would have been taken and placed in the property inventory at the jail to which defendant was transported. The trial court ultimately rejected all the state's arguments and suppressed the clothing.

The state then elected to follow two different procedural courses simultaneously. One course involved applying for a search warrant authorizing a new seizure of the clothes, which continued to be housed in an evidence locker at the Salem Police Department. The affidavit supporting the application for that search warrant described evidence that connected defendant to the crime and also pointed to the potential significance of the clothes. The affidavit stated that the police had seized the clothing and had retained it at the Salem Police Department because of "exigent circumstances." A circuit court judge granted the application for a search warrant on September 1, 1999, authorizing the police to seize and analyze specified items of clothing "located at the Salem Police Department."

The state's second procedural course involved an appeal of the trial court's order suppressing evidence. In that case, the Court of Appeals affirmed the trial court's order, holding that, assuming that the "inevitable discovery" doctrine that the state relied upon could be applied to evidence of the kind at issue, the state had failed to establish with the necessary degree of certainty that the police inevitably would have obtained the evidence by other, legal means. *State v. Johnson*, 177 Or App 244, 252-53, 35 P3d 1024 (2001). In that opinion, the Court of Appeals noted that, although the clothes would have been taken, inventoried, and retained at the jail where defendant was being held on the parole violation, they would have remained defendant's property while he was in custody. The court suggested that, in light of that

that such evidence inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures." *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986). To prevail on an inevitable discovery theory, the state must establish, "by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *Id.* at 226.

fact, the state's evidence on inevitable discovery was insufficient, because it failed to address "how long the clothing would have been kept in the jail, whether it would have been released to a relative or friend of defendant's if he had so requested, or any steps that the police would have had to take to obtain a transfer of items in the jail's possession." *Id.* at 250.

The state opted not to seek review of the Court of Appeals' *Johnson* decision in this court.[3] Instead, the state chose to pursue admission of the evidence solely on the ground that the police had "re-seized" the evidence legally pursuant to the September 1, 1999, warrant.[4]

When confronted with that new bid for admission of the evidence, defendant again moved to suppress. Defendant argued to the trial court that the evidence was tainted by the first, unlawful seizure and that the belated warrant did not purge that taint because it was not a genuinely independent source of the evidence. Defendant noted that the trial court already had ruled that the initial seizure was unlawful. Defendant also stressed that the police had held the property in their own evidence room, had denied defendant's request for return of the property, and had sought a warrant only when the trial court had ordered the evidence suppressed. Finally, defendant argued that it was "only due to the [original] illegal seizure * * * [that] the police [were] able to identify the location of the evidence [for purposes of obtaining the warrant]."

The state responded that, because the police had obtained the warrant without any use of illegally obtained information, there was "no taint to purge." The state also suggested that, because defendant had not attempted to obtain release of the property while it was in the possession of the police, the clothes were in police custody pursuant to an "independent source." Defendant responded to the latter argument by asserting, and later submitting evidence, that

---

[3] The state acknowledges that, in choosing not to seek review, it abandoned any argument that the initial warrantless seizure was lawful.

[4] There was no actual "re-seizure" of the clothing and boots. They remained in the police evidence locker in which they had been placed 18 months before.

he *had* requested the return of the property before the state applied for the warrant.[5]

The ensuing proceedings on defendant's motion to suppress focused on defendant's contention that he had requested the return of the clothing through his girlfriend, McDowell. After hearing testimony and arguments in the matter and examining certain documents *in camera*, the trial court issued a letter opinion that stated the issue to be "whether the defendant failed to request return of his clothing from the police and, if so, does that failure allow the State to successfully argue that the later seizure was independent of the illegal seizure." The trial court found that defendant had requested the return of the clothing through McDowell and that, in any event, the police would not have released the clothing. The court concluded that the warrant and the seizure pursuant to the warrant therefore were not independent of the previous illegal seizure because the police had possession of the clothes *due to* the previous illegal seizure and because, if the property had gone with defendant to the jail, it would have been released to McDowell and would not have been available for the later seizure.

The state requested reconsideration of the letter opinion. The state argued that the trial court had failed to address the state's argument that the second warrant "purged the taint" from the illegal first seizure.[6] The state also indicated that it was prepared to present testimony that would establish that, even if the police had released the clothing to McDowell, they subsequently would have recovered the clothing from her. To the extent that it made that showing, the state argued, the evidence would be admissible under *Murray v. United States*, 487 US 533, 108 S Ct 2529, 101 L Ed 2d 472 (1988), *State v. Smith*, 327 Or 366, 963 P2d

---

[5] Defendant also moved to controvert the affidavit submitted in support of the warrant application, arguing that the affidavit contained certain false statements, including the statement that the police had seized the clothes under exigent circumstances. The trial court found that the statements at issue had been controverted, but concluded that, if the court excised the controverted statements, the resulting application still would support probable cause to seize the clothing. The correctness of that ruling is not before us.

[6] We assume that the state there was referring to its argument that, because it had received the property pursuant to a warrant that did not rely on information obtained from the prior illegal seizure, there was no "taint" to "purge."

642 (1998), and *State v. Sargent*, 323 Or 455, 918 P2d 819 (1996). *Murray* is the preeminent United States Supreme Court case dealing with the "independent source" theory; *Smith* and *Sargent* stand for the proposition that evidence that initially is seized unlawfully will not be suppressed if the unlawful seizure is causally unrelated to a later seizure pursuant to lawful warrant.

The trial court permitted the state to present evidence to support the contention that, even if the clothes had gone with defendant to the jail, the police ultimately would have seized them. The state offered the testimony of Herring, an employee of the Marion County Jail, about inmate property procedures at that facility and the testimony of Salem Police Detective Stoelk, who described steps he would have taken lawfully to seize the clothes that defendant was wearing when he was arrested, if the police had not seized those items unlawfully at police headquarters.

■    After the hearing on reconsideration, the trial court adhered to its earlier position. In its final order, it summarized the state's argument as follows:

> "[T]he state argues that the seizure of evidence pursuant to the September 1, 1999, search warrant either purged the taint of the previous illegal seizure of evidence, or alternatively, that the evidence is in state custody pursuant to an independent source."

The trial court concluded that the state had the burden of proof with respect to those issues. The trial court further concluded that, based on findings in the order on reconsideration and findings in its previous order, the state had failed to meet its burden of proof. The trial court included the following statement in its findings:

> "The State has failed to prove that if the State had not seized defendant's property that the State would have been able to locate and seize defendant's property pursuant to a valid search warrant."[7]

---

[7] Although treated as a finding of fact by the trial judge, the court's statement was not, strictly speaking, a finding. Instead, it was a characterization of the state of the evidentiary record, *i.e.*, it was a ruling that the state's evidence was not sufficiently persuasive to justify a finding that the state wanted.

As noted, the state now appeals that decision under ORS 138.060(2). Although, in the trial court, the state made separate "purging the taint" and "independent source" arguments, it now presents those arguments as variations on a single theme, asserting that the seizure of the clothes pursuant to the September 1, 1999, warrant operated as an "independent source" of the evidence and, thus, "purged the taint" of the prior unlawful seizure. The state contends that, in rejecting that argument, the trial court erroneously focused on the fact that, without the illegal seizure, the evidence could have, or would have, been in McDowell's possession. The state contends that the trial court failed to recognize that, for purposes of the second seizure, the location of the evidence is merely "incidental," by which the state means that officers would have found and seized the evidence even if it had not been seized and retained unlawfully in the police evidence lockers.[8] In so arguing, the state purports to invoke the "independent source" doctrine, which has developed in the context of Fourth Amendment search and seizure jurisprudence. The independent source doctrine permits the introduction of "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray*, 487 US at 537.

That is, the state's theory is that, under Oregon law, defendant's clothes would not be subject to suppression if, after the initial illegal seizure, they were reseized pursuant to a lawful warrant that was entirely independent of, and was not obtained by exploitation of, the previous illegality. Before we rule on such a question, we first must determine whether that theoretical construct is a viable one in light of the evidence in the record and the trial court's rulings on that evidence. However, before we turn to that task, we wish to examine an assumption that the parties and the trial court seemed to accept as a given, *viz.*, that the state bore the burden of persuasion with respect to the issues being decided.

---

[8] The state apparently has abandoned its argument below that the police had custody of the evidence pursuant to an independent source because defendant never had requested release of the evidence. As noted, the trial court expressly found that defendant had requested release of the evidence to McDowell.

Given that we now are considering the reseizure of the clothes pursuant to a warrant, that allocation of the burden to the state might seem to be contrary to the oft-cited rule that, when state agents have acted under authority of a warrant, the burden is on the party seeking suppression (*i.e.*, the defendant) to prove the unlawfulness of a search or seizure. *See, e.g.*, *Sargent*, 323 Or at 460 (stating that rule). However, it is uncertain whether and how that general rule applies when, as here, the evidence in question first was seized unlawfully and without a warrant and the defendant asserts that a later, warranted "reseizure" is tainted by the unlawful, warrantless seizure. No Oregon cases of which we are aware expressly address the question as to which party carries the burden of proof under those circumstances.

■ Some federal courts, on the other hand, have addressed that issue. Federal cases suggest that, when a defendant seeks to suppress evidence on a theory that the evidence derives from, or is "tainted" by some earlier constitutional violation by government agents, a bifurcated burden of proof should apply: Although a defendant seeking suppression "must go forward with specific evidence demonstrating taint," the government has "the ultimate burden of persuasion to show that its evidence is untainted." *Alderman v. United States*, 394 US 165, 183, 89 S Ct 961, 22 L Ed 2d 176 (1969). The federal courts have described the defendant's burden in terms of establishing a "factual nexus" between the unlawful police conduct and the challenged evidence—at a minimum, the existence of a "but-for" relationship. *See U.S. v. Kandik*, 633 F2d 1334, 1335 (9th Cir 1980) (describing the defendant's burden); *U.S. v. DeLuca*, 269 F3d 1128, 1132 (10th Cir 2001) (same); *U.S. v. Nava-Ramirez*, 210 F3d 1128, 1131 (10th Cir), *cert den*, 531 US 887 (2000) (same). The same courts have indicated that, if a defendant makes that initial showing, then the burden of proof shifts to the government to show that the unlawful conduct has not tainted the evidence, "either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *DeLuca*, 269 F3d at 1132.

We believe that the federal courts' approach to allocating the burden of proof in such circumstances is a reasonable one and that it is not inconsistent with the general rule that we have noted. The general rule derives from the presumption of regularity that arises out of the fact that, in a warranted search, an independent magistrate already has determined that probable cause exists. *See* 5 Wayne R. LaFave, *Search and Seizure*, § 11.2(b), 17 (3d ed 1996) (suggesting that as basis for allocating of burden of proof to defendant). However, even assuming that the issuance of the warrant was proper, if the defendant is able to show that the evidence obtained therefrom is connected to some prior governmental misconduct, the presumption of regularity is undermined and the burden of proof fairly may be shifted to the government to show that the evidence is not tainted by the misconduct.

In the present case, the trial court announced that the state bore the burden of proof with respect to the issues that were before it—whether the September 1, 1999, warrant either purged the taint of the prior unlawful seizure or served as an "independent source" of that evidence. The trial court never acknowledged expressly that defendant carried an initial burden of producing evidence of taint. However, even if the trial court did not apprehend fully the sequence of burdens as we have described them, it is clear that defendant did meet his burden of showing a factual nexus between the evidence at issue and the prior unlawful conduct, and that he succeeded in shifting the burden of persuasion on the issue of taint to the state. In so holding, we rely on the fact that the police used information derived from that earlier unlawful seizure, *viz.*, the fact that the clothes could be found in a police evidence locker, when they later applied for a search warrant. The existence of that factual connection is sufficient to shift the burden of persuasion regarding taint to the state.

The foregoing leaves us to consider whether the state met its burden of showing that the proffered evidence was not tainted—a burden that the state attempted to meet in this case by showing that the warranted search was wholly independent of the earlier unlawful one. That is the ultimate issue that the trial court decided against the state and the

one that is at the center of the state's appeal. As noted, the trial court did not agree that the warrant that the police ultimately obtained truly was independent of the earlier illegal seizure. The trial court found that the police possessed the clothes at the time of the later, warranted seizure because of the prior unlawful seizure. The trial court also found that the police had denied defendant's lawful request for release of the clothes and that the clothes would not have been in the possession of the police if they had proceeded lawfully. Finally, the court found that the state had failed to establish that the police ultimately would have obtained the clothes in any event.

The state argues that the trial court placed undue emphasis on a minor quibble respecting the location at which the clothes would have been seized:

> "The circuit court's concern seems to have been that, if the police had not seized the items as evidence, the items could have or would have been released to Jeannie McDowell, and that, as a consequence, the items would not have been in the evidence locker when the detectives went to seize them pursuant to the warrant. That fact is purely incidental. The court's analysis ignores the fact that the officers obtained *no advantage* by holding the items in the evidence locker that they would not have had if Jeannie McDowell had taken the items home with her. In fact, because the items would have been found in and seized from either location, there was not even a 'but for' link between the possession of the items in the evidence locker and their seizure pursuant to a warrant."

In so arguing, the state asserts as fact that the police ultimately would have found and seized defendant's clothes if they had been released to McDowell. The problem with that argument is that it assumes a fact that, according to the trial court's express finding, the state failed to establish at the hearings on the motion to suppress.

■ ■ The state never addresses that trial court ruling directly, perhaps believing that the evidence is so clearly to the contrary that the finding does not merit an argument. The state simply states, in its argument before this court, that "the testimony of Detective Stoelk, Jeannie McDowell, and Debra Herring, established that, even had the evidence

been stored as inmate property and been released to McDowell, its new location would have been discovered and the search warrant would have been executed there." However, our standard of review does not permit us to dismiss a trial court's ruling so lightly. It is familiar doctrine that we are bound by a trial court's findings of fact, if there is evidence in the record to support them. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968); *State v. Miller*, 300 Or 203, 227, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986). Although this court never has had occasion to say so expressly, we think that it follows from the foregoing rule that it equally is true that we are bound by a trial court's "finding" that a party's evidence is not sufficiently persuasive. We believe that that rule follows, because it incorporates the same judicial respect for the trial court's weighing of the evidence. Thus, unless the evidence in a case is such that the trial court as finder of fact could decide a particular factual question in only one way, we shall in the future consider ourselves equally bound by a trial court's acceptance or rejection of evidence.

We turn to the evidence that the trial court heard in this case. As noted, the state offered evidence to show that the police would have obtained the clothes at issue through lawful means. Herring, an employee of the Marion County Jail, testified about that facility's process for obtaining release of an inmate's property to a third person. Herring stated that there was a standard preprinted form by which inmates could request such a release, that the person to whom the property was released would have to present photo identification, and that she sometimes refused to release clothing to third parties because of "workload" issues, although there was no identifiable authority for such refusals.

Stoelk, the detective involved in the Thompson murder investigation who had taken part in the initial seizure of defendant's clothes, testified about what he would have done if defendant's clothes had not been seized, but, instead had been placed in the inmate property inventory at the Marion County Jail. Stoelk testified that, if jail personnel had released the clothes to a third party, he would have identified that third party through the records of such releases and

would have tracked down the clothes in that manner. Stoelk testified that he was aware of the inventory room procedures at the Marion County Jail and, in the past, had used them to track down items that had been released from that jail's property inventory. Stoelk acknowledged that he was not familiar with procedures at the Polk and Yamhill County jails, where defendant had been lodged before his arrest in June 1998 on the Thompson murder charge.

Stoelk also testified that he knew McDowell and knew where she lived and that, if the property had been released to her, he would have included an addendum in his search warrant application requesting authority to search her home for the clothes. Stoelk acknowledged that he was aware of McDowell's whereabouts for only a short period after defendant's arrest, but he asserted that he would have had methods for discovering her new address if he wished to find her, such as checking for a change of address on McDowell's driver license, checking voter records, asking her landlord, and the like. Stoelk also testified about the extreme clutter in McDowell's home, including mountains of clothes that reached nearly to the ceiling. Stoelk testified that McDowell "had the appearance of getting rid of nothing." He also acknowledged that McDowell probably would have great difficulty knowing what was in her residence.

In addition to the foregoing, the state, in its argument to this court, also relies on certain testimony by McDowell to the effect that she would have kept defendant's clothes if they had been released to her. The following interchange is pertinent:

"Q: What did [defendant] want you to do with the property?

"A: It was probably my idea to hold it.

"Q: Hold onto it? That's it?

"A: Sure.

"Q: Didn't want you to take it anywhere? He just wanted you to hold it?

"A: Where would I take it? What would I do with it?

"* * * * *

"Q: And so it would have just stayed there until he got out of jail?

"A: His things are still at my house.

"Q: OK. Great. It would have never traveled anywhere?

"A: Just with me.

"THE COURT: Presumably it would have been just as safe with you as all of the letters that Mr. Johnson mailed to you.

"THE WITNESS: Well, I—I was seriously, seriously ill at that point in time, and I lose things even still.

"THE COURT: I'm sorry. You lose things?

"THE WITNESS: I lose things. I bury things. I'm not able to take care of my house still. I'm disabled. And I've got a lot of stuff, and things get buried. And that was important to me that that not get buried, it not get lost."

After considering the foregoing evidence, the trial court suggested that the state's theory was problematic in light of the court's previous finding that any request by defendant to release the clothes would have been a useless act (because the police believed that the clothes contained evidence and never would have permitted their release). The court indicated, moreover, that, even if it assumed that the police would have proceeded lawfully, there were still too many "ifs." The court was particularly cognizant of the fact that the state bore the burden of proof and had to show that it was more likely than not that the police ultimately would have obtained the evidence:

"[I]t's a whole series of if this, then this. But had the defendant's property been in the Marion County Jail and had he asked for it to be released to Ms. McDowell and had the jail actually released it to Ms. McDowell that it would have remained in a place that the police agency[,] had they discovered their mistake, would have been able to find it or find her and then have probable cause to believe that the property was still with her in order for a warrant [to issue], because the warrant needs to say not just that the property is something that they need for law enforcement purposes but that it's more likely than not in a particular place. And based on the evidence that I have, I just can't make that

finding that it would more likely than not have been in a place where the police agency would have been able to find it."

■    Our own review confirms the trial court's assessment that the evidence is mixed with regard to whether the police ultimately would have obtained the evidence lawfully, had the unlawful seizure not occurred. There was evidence that McDowell had moved to places unknown to the police during the relevant time period, had given at least some of defendant's property to a person whom she could not even identify clearly, and that, by her own account, things got "buried" in her home, all of which runs counter to the state's contention that it inevitably would have seized the clothes lawfully if they had been released to McDowell. It may be true that the state of the evidence is such that the trial court *could* have found that the state had met its burden. It might even be true that, if this court were empowered to review the evidence *de novo*, we would make such a finding. However, we cannot say that the evidence was of such a character or of such weight that the trial court was required to rule in the state's favor. It follows that the trial court's ruling that the state had failed to meet its burden of proof was a permissible one to which we must, and do, defer.

Because the state's argument relies entirely on our acceptance of a view of the facts that is contrary to the one taken by the trial court, we reject that argument and affirm the trial court's ruling that the state failed to meet its burden of showing that the seizure of the clothes pursuant to the later-obtained warrant purged the taint of the prior warrantless and unlawful seizure.

The order of the circuit court is affirmed.