*131 BALMER, C. J.
This case requires us to consider once again the circumstances in which a person’s voluntary consent to a search is the result of exploitation of prior illegal police conduct — leading to the exclusion of the evidence obtained— and when it is not. The state charged defendant with possession of methamphetamine. Before trial, defendant filed a motion to suppress evidence seized by the police, arguing that his consent to search was the product of an illegal seizure and, therefore, that the evidence was inadmissible under Article I, section 9, of the Oregon Constitution.[1] The trial court denied the motion. Defendant entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. The Court of Appeals reversed, relying in part on our decision in State v. Hall, 339 Or 7, 115 P3d 908 (2005), and holding that, if the stop was unlawful, the evidence from the search was presumptively obtained through exploitation of the earlier unlawful conduct. State v. Hemenway, 232 Or App 407, 222 P3d 1103 (2009). For the reasons that follow, we reverse the decision of the Court of Appeals. In doing so, we modify the exploitation analysis announced in Hall.
BACKGROUND
We take the facts from the Court of Appeals opinion.
“In April 2007, deputies Orella and Russell responded to a call from Taylor, defendant’s girlfriend, regarding Taylor residence’s electric power and the whereabouts of Taylor’s son. The deputies, in separate cars, arrived at Taylor’s residence just before midnight. Both deputies parked in the driveway behind defendant’s truck, blocking the truck’s exit route. The deputies were in uniform, carrying guns, and driving marked sheriff’s vehicles. Defendant and Taylor were both outside the house when the deputies arrived. Deputy Orella approached Taylor and instructed *132 defendant to go talk to Deputy Russell. Orella then informed Russell that he had observed a rifle in defendant’s truck.
“Defendant met Russell near the back of the truck and voluntarily explained that he was in the process of moving out of the house and many of his belongings were in the truck, including the rifle and a handgun. Russell asked defendant if he was a felon; defendant responded that he was not. In order to verify defendant’s assertion that he was not a felon, Russell asked for defendant’s name and date of birth. Defendant provided the information to Russell. Defendant asked Russell’s permission to have a cigarette. Russell said that he could, but that he wanted to search defendant to ‘ease his mind.’ Defendant agreed to that search. Russell found a breath mint tin in one of defendant’s pockets. The trial court found that Russell first asked if he could open the tin, and, after defendant agreed, Russell discovered a methamphetamine pipe and a baggie that Russell suspected contained methamphetamine residue. Russell placed defendant under arrest and advised him of his Miranda rights.
“Russell then asked defendant if he had more drugs in the house. Defendant admitted that there might be and consented to Russell retrieving the drug-related items from the house. Defendant accompanied Russell into the house and pointed out where the methamphetamine paraphernalia was, which Russell then located and seized.
“Before trial, defendant moved to suppress all evidence obtained from the warrantless search of his person and residence and his inculpatory statements made to the deputies. Defendant argued that the deputies’ conduct before his grants of consent and statements constituted an unlawful stop under Article I, section 9, of the Oregon Constitution and that Russell exploited the unlawful stop when he obtained defendant’s consents and statements. The trial court determined that defendant was not ‘seized’ by Russell and that defendant’s consents were voluntary. Defendant entered a conditional plea of guilty, reserving the right to appeal the trial court’s denial of his motion to suppress.”
Id. at 409-10.
On appeal, defendant argued that the trial court erred by holding that defendant had not been seized; defendant did not challenge the trial court’s finding that *133 he voluntarily had consented to the searches. The Court of Appeals determined that (1) the officers did not have reasonable suspicion that defendant had engaged in criminal activity; and (2) a reasonable person in defendant’s position would have believed that he had been stopped, “[g]iven that defendant was physically blocked from exiting in his truck by the deputies’ cars, that he was told to speak to Russell and had to alter his course to do so, and that Russell asked if defendant was a felon and subsequently asked for his verifying information.” Id. at 415. The court nevertheless remanded defendant’s case for the trial court to determine whether defendant subjectively had believed that he had been stopped. Id. Under this court’s case law at the time of the Court of Appeals decision, a seizure for purposes of Article I, section 9, occurred whenever an individual subjectively “believe[d]” that a law enforcement officer had restrained that individual’s liberty or freedom of movement and such belief was objectively reasonable. See State v. Holmes, 311 Or 400, 409-10, 813 P2d 28 (1991), overruled in part by State v. Ashbaugh, 349 Or 297, 316, 244 P3d 360 (2010).
Turning to the question whether, if defendant had been unlawfully stopped, the evidence from the consent searches should have been suppressed, the Court of Appeals held that it should. Hemenway, 232 Or at 416-18. Applying Hall, the court held that the state had failed to show that defendant’s voluntary consents were attenuated from the potentially illegal stop. For that reason, if the stop was unlawful, the evidence was obtained through exploitation and should have been suppressed.
Defendant and the state each requested an extension of time to file their respective petitions for review pending this court’s decision in Ashbaugh. In that case, we modified the test for whether the police have seized a person for purposes of Article I, section 9, eliminating the subjective component of the test. Ashbaugh, 349 Or at 316. After the opinion in Ashbaugh issued, defendant and the state both petitioned for review in these cases. Defendant argued that, under Ashbaugh, this court should reverse the part of the Court of Appeals opinion that remanded his case to the trial court for an investigation into his subjective belief *134 regarding whether he had been stopped and should order the suppression of the drug evidence under Hall. The state conceded that defendant had been stopped under Article I, section 9, as explained in Ashbaugh, but asserted that Hall was incorrectly decided and should be overruled. We consolidated the petitions and allowed review.
On review, the state argues that Hall — discussed further below — was incorrectly decided because a voluntary consent search is necessarily “reasonable” under Article I, section 9, of the Oregon Constitution and, thus, any evidence seized pursuant to a voluntary consent search is admissible regardless of any prior illegal conduct by law enforcement. Defendant responds that Hall was correctly decided and that, under Hall, the evidence seized pursuant to defendant’s consent must be suppressed because the evidence was derived from the illegal stop.
We begin with a summary of the relevant parts of Hall. In that case, as here, the defendant consented to a search voluntarily after being stopped by police, and the police discovered drugs. The defendant moved to suppress, arguing that the stop had been illegal and that that illegality required suppression of the evidence despite his voluntary consent to the search. The trial court denied the motion, but the Court of Appeals reversed and ordered the evidence suppressed. 339 Or at 10-12. The state petitioned for review, arguing, among other things, that the defendant’s voluntary consent had severed the causal link between the illegal police conduct and the evidence. Thus, in the state’s view, the exclusionary rule did not bar the evidence, because the illegal conduct did not bring the evidence to light. Id. at 14. On review, the majority of this court first determined that the stop was illegal under Article I, section 9. Id. at 19. As discussed below, the majority then addressed the proper framework for determining whether the evidence gleaned from the consent search nevertheless must be suppressed because of the illegal stop.
The majority in Hall began by outlining the history of the exclusionary rule in Oregon and analyzing this court’s past treatment of consent searches. The exclusionary rule is constitutionally mandated and serves to vindicate *135 a defendant’s personal right to be free from unreasonable searches and seizures. Id. at 24. The federal exclusionary rule, by contrast, is premised on deterring police misconduct. Id. at 23. The goal of the exclusionary rule in Oregon is to “restore a defendant to the same position as if‘the government’s officers had stayed within the law’” by suppressing evidence obtained in violation of the defendant’s rights. Id. at 24 (quoting State v. Davis, 295 Or 227, 234, 666 P2d 802 (1983)).
The majority noted that illegal police conduct may negate a defendant’s consent to search and require suppression of evidence in two ways. First, the consent itself may be “involuntary” if the illegal police conduct overcame the defendant’s free will, and the consent instead resulted from “police coercion.” Id. at 20. Second, evidence gained through a voluntary consent search still may require suppression if the defendant’s consent to search “derived from” the prior illegal police conduct. Id. at 21. The majority rejected the state’s argument that only the voluntariness inquiry was necessary, stating that, even when a defendant voluntarily consents,
“this court’s case law * * * makes clear that Article I, section 9, also requires the consideration of the effect of the unlawful police conduct upon the defendant’s decision to consent, even if that conduct did not rise to the level of overcoming the defendant’s free will.”
Id. at 32. In particular, the majority relied on State v. Kennedy, 290 Or 493, 624 P2d 99 (1981), and State v. Rodriguez, 317 Or 27, 854 P2d 399 (1993), noting that those cases borrowed from the exploitation analysis that the United States Supreme Court announced in Wong Sun v. United States, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), to analyze whether Article I, section 9, required suppression of evidence obtained through valid consent searches.[2] Although neither Kennedy nor Rodriguez required suppression on the facts of those cases, the majority in Hall noted that both cases *136 analyzed the issue as whether the defendant’s voluntary consent “derived from” the prior illegal seizures. 339 Or at 30-32. The majority determined that “consent is insufficient to establish the admissibility of evidence from a warrant-less search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant’s rights under Article I, section 9.” Id. at 27 (citing Rodriguez, 317 Or at 41-42).
The majority in Hall summarized its conclusions as follows:
“After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant’s consent, then the state has the burden to prove that the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant’s consent. A causal connection requiring suppression may exist because the police sought the defendant’s consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant’s free will, significantly affected the defendant’s decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant’s consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances — such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct.”
Id. at 34-35.
Justice Durham filed a separate opinion, joined by Justice Gillette, concurring in part and dissenting in part. The dissent agreed that the defendant had been illegally stopped, but disagreed that that prior illegality should result in the suppression of the evidence gained through the *137 consent search. The dissent asserted that the defendant’s “voluntary consent to the search demonstrates that the disputed evidence came to light as the result of a reasonable, not unreasonable, search.” Id. at 39 (Durham, J., concurring in part and dissenting in part). The dissent took issue with the majority’s reliance on Rodriguez, 317 Or 27, which the dissent characterized as incorrectly focusing on the police decision to seek consent, “rather than the voluntariness of the defendant’s consent.” Id. at 50. In the dissent’s view, the inquiry into the voluntariness of a defendant’s consent takes into account any prior illegal conduct by the police. Id. at 46. And, a voluntary consent to search fully vindicates the defendant’s rights under Article I, section 9, because the evidence was gained as a result of that consent and not by way of the prior illegality. Id. at 51.
CLARIFICATION OF HALL
The state argues that we should overrule our 2005 decision in Hall, 339 Or 7. “[T]he principle of stare decisis means that the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent.” State v. Ciancanelli, 339 Or 282, 290, 121 P3d 613 (2005). The state thus has the burden of demonstrating that we should reconsider and reject the rule announced in Hall. The state argues, among other things, that Hall failed to apply this court’s “usual paradigm” for analyzing constitution provisions; that the decision erroneously construed the text of Article I, section 9; and that it departed from earlier case law. We have considered — and we reject — the state’s argument that Hall suffers from all of the deficiencies that the state asserts. We also note that, in seeking to overrule Hall, the state relies in substantial part on arguments that were, in fact, raised by the Hall dissent and considered and rejected by the majority.
Although we reject the state’s assertion that Hall articulated an impermissible construction of Article I, section 9, we agree that Hall’s test for exploitation is flawed in some respects and bears refinement. The state argues that internal contradictions mar both steps of Hall’s exploitation test and make the test difficult in application and uncertain *138 in result. The state is correct that, in practice, the Hall test has caused some confusion. Parties and the courts have struggled to determine when a defendant has met his or her burden of establishing a “minimal factual nexus” and whether the police exploited their illegal conduct to obtain a defendant’s consent to search. We turn to those issues.
We begin with a review of the relevant legal principles. In the context of Hall and in this case, the inquiry into whether evidence obtained pursuant to a consent search must be suppressed involves three overlapping issues: (1) whether the initial stop was lawful; (2) whether the defendant’s consent to the search was voluntary; and (3) assuming that the stop was unlawful and the consent voluntary, whether the police exploited the illegal stop to obtain the disputed evidence.
The first issue is the lawfulness of the police-citizen encounter. There is nothing constitutionally suspect under Article I, section 9, about police engaging a citizen in conversation and then requesting that citizen’s consent to search. Ashbaugh, 349 Or at 308-09. In contrast to “mere conversation,” which does not implicate Article I, section 9, an officer “stops” an individual — raising potential constitutional issues — when the officer “intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual’s liberty or freedom of movement.” Id. at 308-09, 316. Before stopping an individual, Article I, section 9, requires the police to have reasonable suspicion that the individual is involved in criminal activity. In the absence of reasonable suspicion (or some other permissible concern, such as officer safety), the individual has the right to be free from police interference and may terminate an encounter with police at will. See id. at 308-09.
The second issue is whether the consent to search was voluntary. The proper test for voluntariness of consent “is to examine the totality of the facts and circumstances to see whether the consent was given by defendant’s free will or was the result of coercion, express or implied.” Kennedy, 290 Or at 502 (citing Schneckloth v. Bustamonte, 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973)). To prove the voluntariness of a consent to search in the context of *139 an illegal stop, the state must prove that the defendant’s consent was the product of his own free will, rather than the result of coercion. State v. Wolfe, 295 Or 567, 572, 669 P2d 320 (1983); see also State v. Stevens, 311 Or 119, 136, 806 P2d 92 (1991) (consent to search voluntary when no evidence that “the police intimidated or coerced defendant in any way”); Kennedy, 290 Or at 504, 506 (consent to search voluntary in light of “an almost total absence of coercive factors”).
The specific focus of Hall and of this case is the third part of the inquiry: If the police-citizen encounter was unlawful, but the consent to search was voluntary, the issue becomes whether the police exploited their illegal conduct to obtain the consent to search and, by that means, the evidence in question. In Wong Sun, the United States Supreme Court described exploitation as “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” 371 US at 488 (internal quotation marks and citation omitted). Since at least Kennedy, this court has referred to and used the exploitation analysis announced in Wong Sun in the context of determining whether evidence obtained through voluntary consent searches should be suppressed. See Kennedy, 290 Or at 501 (“[E]vidence [gained from a consent search during or after alleged police illegality] is to be suppressed only if it is found that the consent was gained by exploitation of the illegality or that defendant’s free will was tainted by the illegal police conduct.” (Citing other state and federal jurisdictions that apply Wong Sun to consent searches.)). The United States Supreme Court also has employed exploitation analysis in the context of consent searches, even when the consent was “voluntary,” in the sense that it was not coerced. See, e.g., Florida v. Royer, 460 US 491, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (voluntary consent to search tainted by illegal detention by police).
The relationship between the voluntariness of consent and exploitation, of course, is a close one: often, when the circumstances support the determination that consent was voluntary, they also will support the conclusion that *140 there was no exploitation of any prior police misconduct, and the converse is also true. Yet it is important to emphasize that the tests are not identical and that they address separate concerns. As Professor LaFave notes,
“While there is a sufficient overlap of the voluntariness and [exploitation] tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality.”
Wayne R. LaFave, 4 Search and Seizure § 8.2(d), 76 (4th ed 2004) (emphasis in original; footnote omitted). We agree. Applying both the tests for voluntariness of consent and for exploitation is necessary to vindicate a defendant’s right to be free from unreasonable search and seizure. When the police stop an individual without reasonable suspicion, the individual’s liberty is restrained in violation of Article I, section 9. Because the person stopped is unable to terminate the interaction with police, he or she is subject to police authority in excess of constitutional bounds and is thereby placed at a disadvantage relative to the constitutional position that he or she would have occupied absent the illegal police interference. Exploitation analysis recognizes that police conduct that constitutes an illegal stop may fall short of coercing a defendant to consent to a subsequent request to search, but nevertheless may require suppression because the police took advantage of information gained from their illegal conduct to obtain consent — an advantage that they would not have had had the police stayed within the bounds of the law. Hall, 339 Or at 27-28. It is that exploitation of the prior police illegality that must be remedied (or vindicated). See State v. Sargent, 323 Or 455, 462-63, 918 P2d 819 (1996) (suppression of evidence required only when the evidence is tainted by the constitutional violation); State v. Williamson, 307 Or 621, 626, 772 P2d 404 (1989) (search not valid when consent is “obtained under the pressure of police action that became available to police only by the prior unauthorized conduct”).
With that background in mind, we turn to the exploitation test articulated in Hall. As noted, Hall announced *141 a two-part test for determining whether evidence acquired from a voluntary consent search must be suppressed because the consent was derived from an illegal seizure. First, the defendant must establish a “minimal factual nexus — that is, at minimum, the existence of a ‘but for’ relationship— between the evidence sought to be suppressed and prior unlawful police conduct.” 339 Or at 25. Once the defendant establishes that causal link, the burden shifts to the state to prove that the evidence nevertheless is admissible because “the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct.” Id. at 34-35.
For the reasons that follow, we disavow the “minimal factual nexus” part of the Hall test and instead hold that, when a defendant has established that an illegal stop occurred and challenges the validity of his or her subsequent consent to a search, the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the consent, even if voluntary, was not the product of police exploitation of the illegal stop. In deciding whether the voluntary consent was a product of police exploitation of the illegal stop, the court must evaluate whether the police took advantage of the illegal aspects of the earlier police behavior to obtain consent or whether other circumstances were sufficient to purge the taint of the prior illegality on the evidence that the police ultimately obtained. As noted in Hall, 339 Or at 44, the state also may prove that the evidence is admissible by showing that the evidence was gained through an independent, lawful source or that the evidence inevitably would have been discovered by the police using lawful procedures.
As discussed further below, we disavow the “minimal factual nexus” part of the Hall test because it was drawn from a case that arose in a significantly different procedural context, and it did not take into account a relevant statute. Moreover, since this court issued Hall, the test has been unevenly applied and, apparently, has proved confusing to lawyers and judges.
Hall adopted the “minimal factual nexus” component ofits test from State v. Johnson, 335 Or 511, 73 P3d 282 (2003). In that case, the defendant sought to suppress evidence that *142 had been seized illegally but then later “reseized” pursuant to a warrant. The state asserted that the warrant was “entirely independent of, and was not obtained by exploitation of, the previous illegality.” Id. at 519. Ordinarily, a search performed under authority of a warrant is subject to a presumption of regularity, and the party challenging the evidence bears the burden to prove the unlawfulness of the search or seizure. Id. at 520-21. Before addressing the state’s exploitation argument, the court addressed which party bore the burden with regard to proving exploitation or its absence. Because of the presumption of regularity when the police act under authority of a warrant, the court concluded that the defendant had an initial burden to establish a “factual nexus” between prior illegal police conduct and the evidence gained pursuant to an independently valid warrant. Id. at 521. Once a defendant demonstrates that nexus, the court in Johnson wrote, “the presumption of regularity [of the warrant] is undermined and the burden of proof fairly may be shifted to the government to show that the evidence is not tainted by the misconduct.” Id.
This court’s reliance in Hall on Johnson was misplaced. By statute, whenever a defendant challenges evidence seized following a warrantless search, the state bears the burden of proving “by a preponderance of the evidence the validity of the search.” ORS 133.693(4); State v. Tucker, 330 Or 85, 87, 997 P2d 182 (2000). When the police conduct a search and seize evidence without a warrant, as in Hall and in this case, there is no presumption of regularity to overcome, because there was no warrant and, thus, there is no need for a threshold showing by the defendant to shift the burden to the state. The state already has the burden to prove that the warrantless search was valid.
Moreover, under the Hall test, parties were required to first focus on whether or not a “minimal factual nexus” was present, rather than examining the more central issues of (1) whether the police had acted unlawfully in making the initial stop, and (2) whether the later consent to search and subsequently discovered evidence were obtained through exploitation of the unlawful police conduct. However, exploitation analysis already considers the existence of a “minimal *143 factual nexus,” because determining whether the police exploited their unlawful conduct to gain the disputed evidence necessarily requires an examination of the causal connection between the police conduct and the defendant’s consent. Accordingly, the “minimal factual nexus” test is not analytically significant in determining whether the consent was the product of the illegal police conduct, such that evidence obtained pursuant to that search must be suppressed. Additionally, it is unnecessary to shift the burden of proving lack of exploitation to the state because, as noted, the state already bears the burden of proving that evidence obtained from a warrantless search is valid.
Because the “minimal factual nexus” test adopted in Hall does not have firm grounding in our case law and is inconsistent with ORS 133.693(4) — and because the application of the test has been unclear in our cases since Hall and has proved confusing to litigants and the courts — we disavow that part of the Hall analysis.
We now turn to the remaining — and more central— part of the Hall exploitation test. That test requires the state to prove “that the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct.” 339 Or at 35. Hall posited two scenarios that require suppression:
“A causal connection requiring suppression may exist because the police sought the defendant’s consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant’s free will, significantly affected the defendant’s decision to consent.”
Id. Hall identified three factors for assessing whether the causal connection “significantly affected” the defendant’s decision to consent and thus requires suppression:
“(1) the temporal proximity between the unlawful police conduct and the defendant’s consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances — such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct.”

Id.

*144 The state asserts that the Hall test does not afford sufficient weight to a defendant’s decision to voluntarily relinquish his or her Article I, section 9, right to be free from unreasonable governmental searches and seizures because, under Hall, suppression almost always will be required when consent is granted in close temporal proximity to an illegal stop. In Hall itself, the court required suppression, “[g]iven the close temporal proximity between the illegal detention and defendant’s consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct.” Id. at 36. This court’s cases following Hall have reached similar results. See, e.g., State v. Rodgers/Kirkeby, 347 Or 610, 630, 227 P3d 695 (2010) (evidence suppressed under Hall when consent granted in close temporal proximity to illegal stop and state failed to demonstrate intervening or mitigating circumstances); State v. Ayles, 348 Or 622, 637-39, 237 P3d 805 (2010) (same).
We agree that the exploitation test announced in Hall does not account sufficiently for the importance of a defendant’s voluntary consent to search. Our cases demonstrate that, in some situations, a defendant’s voluntary consent itself may be sufficient to demonstrate that the search was reasonable and permitted, notwithstanding the prior illegality. See Rodriguez, 317 Or at 41-42; Williamson, 307 Or at 626 (both rejecting proposition that consent “can never legitimize” a search following illegal police conduct). That legal determination — whether consent has so attenuated the connection between the prior illegal conduct and the evidence obtained in the consent search — requires a court to consider the illegal conduct that comprised the stop, the character of the consent, and the causal relationship between the two. In Kennedy, for example, the defendant’s consent was not “tainted” by the illegal police conduct when there was an “absence of any coercive circumstances surrounding [the] defendant’s consent” and the defendant volunteered consent without prompting from the officers. 290 Or at 506.
The court in Hall asserted that the unprompted grant of consent in Kennedy and a similar volunteering of consent in Rodriguez were intervening circumstances that *145 cut off the causal connection between the consent and the prior illegal conduct. Hall, 339 Or at 34. Hall, however, suggested that, had the police asked for (and obtained) the defendant’s consent in Rodriguez — rather than the defendant having volunteered to be searched- — suppression would have been required. Id. By asserting that an unprompted consent is an intervening circumstance sufficient to mitigate the taint of the prior illegality but positing that a requested consent on the same facts would not purge the taint, Hall, in effect, created a per se rule that evidence gained from a requested consent search always must be suppressed if that request occurs in close temporal proximity to the illegal stop and the state cannot demonstrate some breach in the causal chain.
The fact that a consent to search was unprompted or unilateral is relevant evidence of the voluntariness of the consent; as recognized in Kennedy and Rodriguez, unprompted or unilateral consent is less likely to be a product of illegal police conduct. However, the fact that an officer requested consent does not demonstrate that the officer necessarily exploited the prior illegal conduct to gain consent. Rodriguez, for example, involved a voluntary consent following an illegal arrest. The officer did not directly ask the defendant for consent to search, but he did ask the defendant if he had any drugs or guns in his apartment. Rodriguez, 317 Or at 41. In response to that question, the defendant said, “No, go ahead and look.” Id. So, even if the defendant’s consent in Rodriguez was “volunteered,” that consent was, in fact, prompted by the officer’s question about drugs and guns. Rodriguez concluded, nevertheless, that the officer “did not trade on or otherwise take advantage of the arrest to obtain defendant’s consent” in light of the factual circumstances, including the manner in which the defendant had granted consent. Id.
Properly considered, then, a voluntary consent to search that is prompted by an officer’s request can be sufficient to purge the taint of illegal police conduct. Whether the voluntary consent is sufficient to purge the taint — or whether the police exploited their illegal conduct to obtain consent — will depend on the totality of the circumstances. We reject the state’s position that voluntary consent during *146 an unlawful stop necessarily breaks the causal chain and makes the evidence admissible, as we do defendant’s argument that such consent will rarely, if ever, break the causal chain.
In an effort to clarify this complicated area of law, we again review the basic principles at issue. As noted, the overarching inquiry is whether the evidence that the state seeks to introduce must be suppressed because that evidence was obtained in violation of the defendant’s constitutional rights. In the context of Hall and this case, where an illegal stop preceded a consent to search, that inquiry has two prongs. First, the court must assess whether the consent was voluntary. If the consent to search was not voluntary, then the evidence must be suppressed, because only a voluntary consent to search provides an exception in this context to the warrant requirement of Article I, section 9. Second, even if the consent was voluntary, the court must address whether the police exploited their prior illegal conduct to obtain the evidence. Evidence may be tainted directly by the illegal police conduct, if, for example, the police illegally stop a vehicle, allowing them to view contraband that otherwise would not have been visible, and then request the driver’s consent to search the vehicle as a result of what they saw. The consent in that example does not “purge the taint” of the prior illegal stop, because the evidence has a direct causal connection to the illegal conduct.
Evidence also may be tainted if the police obtained the consent to search through less direct exploitation of their illegal conduct. As noted, Hall identified several factors for analyzing whether the police exploited their illegal conduct to obtain consent. Those factors include the temporal proximity between the illegal police conduct and the consent and the presence of any intervening or mitigating circumstances, such as Miranda warnings or other admonitions. Hall, 339 Or at 35, 35 n 21. Additionally, the purpose and egregiousness of the illegal police conduct is relevant to whether the police exploited that conduct to obtain the defendant’s consent to search. See Brown v. Illinois, 422 US 590, 603-04, 95 S Ct 2254, 45 L Ed 2d 416 (1975) (identifying “the purpose and flagrancy of the official misconduct” as relevant to exploitation analysis under the Fourth Amendment); see also *147 Wolfe, 295 Or at 572 (explaining that the Brown exploitation factors, including “the purpose and flagrancy of the official misconduct,” were relevant to determine the effect of police misconduct on the voluntariness of a defendant’s consent to search). Hall asserted, without discussion, that “the Brown factor of‘purpose and flagrancy of the official misconduct’ relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9.” 339 Or at 35 n 21. Although Hall was correct that the Oregon exclusionary rule, unlike the federal one, does not balance the value of deterrence against the costs of exclusion in determining whether evidence should be suppressed, id. at 23-24, we clarify here that the “purpose and flagrancy” of police misconduct nonetheless may play a role in exploitation analysis. For example, police misconduct that is intended to gain a defendant’s consent may well be more likely to substantially affect that defendant’s decision to consent. Likewise, particularly egregious police misconduct — such as excessive use of force in unlawfully seizing a defendant — is more likely to affect the defendant’s decision to consent than more restrained police behavior. The verbal and nonverbal interactions between a defendant and the police leading up to the consent itself are relevant to whether or not the police gained consent through exploitation.
Stated in terms of the state’s burden, the state must prove that the defendant’s consent was sufficient to attenuate the taint of the illegal police conduct. We emphasize that the state is not required to prove that there was no causal link whatsoever between the illegal conduct and consent; rather, the state must prove that the illegal police conduct was a minor or remote cause. See Rodriguez, 317 Or at 40 (“Mere physical presence as a result of prior unlawful conduct does not constitute exploitation of that conduct. Exploitation occurs when the police take advantage of the circumstances of their unlawful conduct to obtain the consent to search.”). As this court often has stated, but-for causation — that, as a factual matter, the illegal police conduct was a necessary link in the sequence of events that led to the consent search and the evidence — is insufficient to require suppression. Kennedy, 290 Or at 500-01. If the *148 defendant shows that he or she was stopped illegally and challenges the validity of his or her consent to search, then the state is required to prove that the police did not exploit their illegal conduct to obtain consent. If the state fails to make that showing, the evidence will be suppressed. However, if the state can show that the illegal conduct did not “significantly affect [ ]” the consent that the police obtained, then the state has established that the police did not exploit that conduct, and suppression is not required. Hall, 339 Or at 35.
In analyzing exploitation, it must be remembered that Article I, section 9, prohibits “unreasonable” searches and seizures. As the preceding discussion demonstrates, the test for whether a consent search conducted following an illegal stop comports with Article I, section 9, cannot be reduced to a simple formula. On the contrary, like all reasonableness determinations, whether a particular search or seizure is unreasonable necessarily depends on the facts of each case.
We again emphasize that, in addition to analyzing possible exploitation of prior police misconduct — the issue in this case — the trial court must consider whether the defendant’s consent was voluntary. If the defendant’s consent was not voluntary, the evidence obtained as a result of that search must be suppressed, regardless of whether any exploitation occurred. See, e.g., State v. Guggenmos, 350 Or 243, 261-62, 262 n 8, 253 P3d 1042 (2011) (finding no reason to determine whether exploitation analysis would require suppression of evidence because determination that consent was not voluntary required suppression); Williamson, 307 Or at 626-27 (Carson, J., concurring) (“The validity of [the defendant’s] consent determines the outcome of this case. If the consent were involuntary and, thus, invalid, the subsequent search and resulting seizure, arrest, and conviction likewise were invalid.”). Because the tests for exploitation and voluntariness, while overlapping, are not identical, it is important that the trial court consider both tests in deciding whether to suppress evidence obtained in a consent search that follows an illegal stop.
We turn to several issues that the dissent raises. The dissent argues, among other things, that we have *149 overruled Hall and other cases sub silentio; abandoned an “objective” and “logical” test for one that is “more intrusive and less clear”; and failed to “grapple sufficiently with whether defendant’s consent was * * * a product of the officer’s unlawful stop and detention.” 353 Or at 163-64 (Walters, J., dissenting). The dissent is wrong on each count. In this case, we clarify the rule announced in Hall. The state asked us to overrule Hall, arguing that, if a defendant who is unlawfully stopped by police voluntarily consents to a search, then that consent always makes the search reasonable and the evidence seized in the search admissible. We expressly reject that argument. Instead, we adhere to Hall in holding that evidence obtained from a consent search must be suppressed if the consent was obtained through exploitation of the unlawful police conduct. Under Hall— and under our decision today — the state must prove that “the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct.” Hall, 339 Or at 35. That analysis is consistent with our reliance in Hall on long-standing exploitation analysis derived from the United States Supreme Court’s decision in Wong Sun and this court’s cases following Wong Sun, including Kennedy and Rodriguez. In this case, as discussed above, 353 Or at 143-47, we modify the exploitation test announced in Hall, because we conclude that it did not give sufficient weight to a defendant’s voluntary consent to a search, as well as to other factors such as the purpose and egregiousness of the police misconduct.[3]
We also disagree that Hall established a logical, easily applied test that we have now abandoned for one that is more intrusive and less clear. Hall, as noted, followed the exploitation analysis of Wong Sun and required consideration of “the effect of the unlawful police conduct upon the defendant’s decision to consent.” 339 Or at 32. That determination “requires examination of the specific facts at issue in *150 a particular case,” including “temporal proximity” between the unlawful police conduct and the defendant’s consent, “intervening circumstances,” and other circumstances that “mitigated the effect of the unlawful police conduct.” Id. at 35. In this case, we point out that the focus on “temporal proximity” too easily leads to the conclusion that any consent search that occurs when a person is unlawfully stopped is invalid, when the better-framed question is whether police exploited the unlawful stop to obtain the consent. It is true that that test requires consideration of the totality of the circumstances of the stop and the police-citizen encounter, but that is often the case in deciding search and seizure cases.
Finally, the dissent’s claim that we fail to “grapple sufficiently” with the question whether the consent given in this case was the “product” of the unlawful stop seems to contradict its argument in favor of a simpler test. As our application below of the test that we have articulated to the facts of this case demonstrates, the test is more nuanced than that announced in Hall and takes into account the totality of the circumstances of the encounter. As we describe below, that test provides a more careful and more full consideration of the facts that lead to a determination as to whether the consent was the “product” of the unlawful police conduct than did the test in Hall.
APPLICATION
We return to the issue in this case. The Court of Appeals concluded that defendant had been stopped “when the movement of his truck was physically constrained, he was directed to move to a location to speak with a deputy, his identification was obtained, and he was questioned by the deputy.” Hemenway, 232 Or App at 411. The court also determined that the stop was unlawful because the police had lacked reasonable suspicion that defendant was engaged in criminal conduct. Id. The state does not challenge the Court of Appeals’ determination that defendant was illegally stopped, and we therefore do not consider that issue further.
After being stopped, defendant then consented to three searches. Defendant agrees that his consent to search *151 was “voluntary” in the sense used in our cases — that is, that the consent was not coerced. The only question, then, is whether defendant’s consent was gained through exploitation of the illegal stop. The Court of Appeals concluded that it was, stating that, because defendant’s consent had occurred “contemporaneously with the stop, with no intervening or mitigating factors [,] [i]t was therefore dependent on the unlawful stop and was not attenuated” under Hall. Id. at 416.
Because exploitation is a fact-intensive inquiry, we review the facts in some detail. Defendant’s girlfriend, Taylor, called 9-1-1 regarding the whereabouts of her son, who was overdue from a visit to a friend’s house, and an unspecified problem with electrical power at the house. Close to midnight and several hours after Taylor had placed the call, two officers arrived at Taylor’s residence in separate vehicles. Defendant was in the process of moving out, and his truck, filled with his belongings, was parked in the driveway. The officers parked in the driveway, behind defendant’s truck. Both Taylor and defendant were outside the residence when the officers arrived. Deputy Orella observed a rifle in defendant’s truck and told Deputy Russell. Orella approached Taylor and directed defendant to speak with Russell.
Defendant stated that he was moving out and that he had a handgun and another firearm in the truck, in addition to the rifle. Russell asked if defendant was a felon and requested defendant’s name and date of birth, which defendant provided. Russell and defendant engaged in what the trial court described as “chit-chat of an innocuous nature,” and, according to Russell:
“[Defendant] asked if he could have a cigarette, and I said that’s no problem. Asked him if he’d have a problem with me searching him just to put me at ease and then he could have his hands wherever he wanted and we wouldn’t have to worry about, you know, knowing if there [were] weapons or anything else on him he shouldn’t have.”
The trial court found that Russell was “concerned because the [defendant had his hands in his pockets which were bulky, had weapons in the vehicle and it was very dark at their location.” Defendant consented to that search. Russell *152 found a small tin in defendant’s pocket and asked if he could open it. Defendant again consented, and the deputy found drug paraphernalia and residue. The officer arrested defendant and gave him Miranda warnings. Defendant then consented to a search of the residence. The trial court found that the tone of the interactions between defendant and Russell had been “normal” prior to the arrest and that defendant had been “cooperative and forthcoming.”
In this court, as noted, the state does not challenge the Court of Appeals’ determination that, at the time of defendant’s consents to the searches, he had just been unlawfully stopped. Accordingly, the temporal proximity factor weighs in defendant’s favor. See Ayles, 348 Or at 637.
On the other hand, there is no evidence that the police conduct in this case was egregious; indeed, the trial court described the interaction between Russell and defendant as “amicable and casual,” and the record amply supports that conclusion. Regarding the purpose of the police actions, the stop occurred around midnight during a welfare check initiated by defendant’s girlfriend, who was concerned about the whereabouts of her son. Although the officers parked their cars in the driveway behind defendant’s truck, there was no indication that they did so for the purpose of blocking him from leaving. Moreover, the police had observed a rifle in defendant’s truck when they first arrived, before any stop occurred. Defendant then had volunteered that he was moving his possessions out of the house and that he also had a handgun and another firearm in the truck. The officers’ interactions with defendant, then, were — at least initially — for the lawful purpose of investigating Taylor’s call to the police. There is no indication that, when the officers stopped defendant, they did so with the purpose of searching for evidence, in contrast to Williamson, 307 Or at 623, 623-24 n 1.
We turn to defendant’s three consents to search. As to each consent, the trial court found that there was no evidence of police coercion, either express or implied, and that each consent had been voluntary. On review, defendant does not dispute that conclusion. He argues, instead, that the police exploited their illegal stop to obtain his consent to the searches that led to the evidence upon which he was *153 convicted and that, under Hall, the evidence therefore must be suppressed. The trial court found that the police made no verbal or physical threats and did not approach defendant with weapons drawn. The trial court described defendant as “cooperative” throughout the entire encounter.
As to defendant’s first consent, the trial court found that, when Russell had asked to search defendant to “ease his mind,” defendant “readily agreed.” Defendant testified at the suppression hearing that he consented to the first search to show that “I wasn’t any kind of a threat to him.” The evidence supports the trial court’s conclusion that defendant had consented to “ease [Russell’s] mind.” The cause of the consent, then, does not appear to be the illegal conduct by the police. Rather, the setting of the interaction — the welfare check, the darkness, defendant’s acknowledged possession of firearms in his truck, and defendant’s desire to have a cigarette while the police conducted the welfare check— and the testimony of defendant and the officers indicates that defendant’s consent was not the product of the unlawful stop. Aside from the close temporal proximity to the stop, there is no evidence that Russell exploited any aspect of the stop to obtain defendant’s first consent. Accordingly, we hold that defendant’s first consent was not a product of the illegal stop.
During the first search, Russell discovered a small tin and requested consent to open it. Defendant responded, according to Russell, in a “low mopey voice” that he could, and Russell discovered a methamphetamine pipe and methamphetamine residue. Russell did not threaten or cajole defendant regarding the tin; he simply requested consent to open it. There is no evidence that Russell took advantage of the fact that defendant was unable to terminate the encounter to gain defendant’s consent to open the tin. Given that the first search, which led to the discovery of the tin, was valid and that there is no indication in the record that Russell exploited the stop to gain defendant’s consent to open the tin, the evidence in the tin was not tainted by the prior illegal conduct. Because the drug evidence from the tin was not tainted by the unlawful stop, defendant’s Article I, section 9, right to be free from unreasonable seizure would not be vindicated by suppressing that evidence.
*154 After discovering the contraband, Russell arrested defendant and gave him Miranda warnings. Defendant acknowledged that there might be more drugs in the house and consented to a search of the house. Defendant then led Russell to more contraband. As noted, defendant’s prior consents were valid, and, therefore, the evidence gained from those searches was not tainted by the illegal stop. Discovery of that drug evidence gave Russell probable cause to arrest defendant. Moreover, defendant had been given Miranda warnings before Russell requested consent to search the house. Accordingly, defendant’s arrest was lawful, and defendant’s voluntary consent to search the house following his arrest did not violate Article I, section 9, of the Oregon Constitution.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

 Article I, section 9, of the Oregon Constitution provides:
“No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

 The majority also discussed and disavowed parts of State v. Quinn, 290 Or 383, 623 P2d 630 (1981), which had relied extensively on Wong Sun. The Hall court’s rejection of the result in Quinn was based on the difference between the state and federal exclusionary rules and Quinn’s questionable application of Wong Sun, but Hall did not reject Quinn’s use of the Wong Sun exploitation analysis. Hall, 339 Or at 26-30.

 The dissent argues that we have “reverse[d]” and “effectively overrul[ed]” Hall and Rodgers/Kirkeby, suggesting that the results in those cases would have been different under the test that we adopt here. Whether the outcome in Hall and Rodgers/Kirkeby would have been different under the analysis set out here is speculative. The issue whether a defendant’s consent was the “product” of unlawful police conduct or, put differently, whether police “exploited” their unlawful conduct to obtain consent, is necessarily dependent on the facts of the particular case and on the record developed in the trial court.